**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| AARON FRANKEL, Derivatively on Behalf of Nominal Defendant ADAPTHEALTH CORP.,<br><br>Plaintiff,<br><br>v.<br><br>RICHARD BARASCH, LUKE MCGEE, STEPHEN P. GRIGGS, JASON A. CLEMENS, SHAW RIETKERK, WENDY RUSSALESI, RODNEY CARSON, FRANK J. MULLEN, GREG BELINFANTI, TERENCE CONNORS, BRADLEY COPPENS, TED LUNDBERG, JOSHUA PARNES, SUSAN WEAVER, DAVID S. WILLIAMS III, DALE WOLF, and ALAN QUASHA,<br><br>Defendants,<br><br>and<br><br>ADAPTHEALTH CORP.,<br><br>Nominal Defendant. | Case No. 2:25-06905-MRP<br><br>**JURY TRIAL DEMANDED**<br><br>**PUBLIC VERSION** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Aaron Frankel ("Plaintiff"), by and through his undersigned attorneys, brings this verified stockholder derivative action on behalf of nominal defendant AdaptHealth Corp. ("AdaptHealth" or the "Company"), against certain of the Company's executive officers and its board of directors (the "Board") for breaches of fiduciary duties and violations of federal law by the Individual Defendants (defined below). Plaintiff's allegations are based on personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on*, inter alia*, the investigation conducted by and through his counsel, which

included, among other things, a review of: (i) documents produced to Plaintiff by AdaptHealth in response to Plaintiff's books and records inspection demand pursuant to 8 Del. C. § 220 (the "Books and Records"); (ii) publicly available information regarding the Company; (iii) the filings in the securities class action captioned *In re AdaptHealth Corp. Securities Litigation,* Case No. 2:23-cv-04104-MRP (E.D. Pa.) (the "Securities Class Action"); (iv) the Company's conference call transcripts and announcements; (v) the Company's filings with the United States Securities and Exchange Commission (the "SEC"); (vi) press releases published by and regarding by AdaptHealth; and (vii) legal filings, news reports, and securities analysts' reports about the Company.

## NATURE OF THE ACTION

1. This shareholder derivative action is brought on behalf of AdaptHealth against certain current and former officers and members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties between at least August 4, 2020, and November 7, 2023, inclusive (the "Relevant Period"), and for violations of federal securities laws.

2. AdaptHealth is purportedly a national leader in providing patient-centered, healthcare-at-home solutions, including home medical equipment ("HME"), medical supplies, and related services. The Company provides a full suite of medical products and solutions designed to help patients manage chronic conditions in the home, adapt to challenges in their activities of daily living, and thrive.

---

[1] The Individual Defendants are Richard Barasch ("Barasch"), Luke McGee ("McGee"), Stephen P. Griggs ("Griggs"), Jason A. Clemens ("Clemens"), Shaw Rietkerk ("Rietkerk"), Wendy Russalesi ("Russalesi"), Rodney Carson ("Carson"), Frank J. Mullen ("Mullen"), Greg Belinfanti ("Belinfanti"), Terence Connors ("Connors"), Bradley Coppens ("Coppens"), Ted Lundberg ("Lundberg"), Joshua Parnes ("Parnes"), Susan Weaver ("Weaver"), David S. Williams III ("Williams"), Dale Wolf ("Wolf"), and Alan Quasha ("Quasha"). "Defendants" means AdaptHealth and the Individual Defendants together.

3. As detailed herein, throughout the Relevant Period, the Company employed a strategy of acquiring and purportedly integrating numerous HME suppliers, particularly in growth industries such as diabetes monitoring devices and sleep aid machines. Most notably, on July 2, 2020, the Company acquired Solara Medical Supplies LLC ("Solara") and ActivStyle Inc. for $487 million. At the time of the acquisition, Solara was the largest independent distributor of continuous glucose monitors ("CGM").[2]

4. Throughout the Relevant Period, the Individual Defendants issued numerous materially false and misleading statements, repeatedly touting the Company's ability to successfully integrate its acquired companies into a single entity, and AdaptHealth's ability to generate increased revenue from the companies it acquired. Additionally, the Individual Defendants assured investors that AdaptHealth had a uniquely effective ability to comply with regulations regarding reimbursement, highlighting the Company's implementation of specific auditing and billing systems, such as "Audit Share," as reducing both fraud and errors.

5. However, in reality, and unbeknownst to investors, the Individual Defendants gutted compliance efforts at its acquired companies and pressured employees to employ illicit billing practices to achieve "revenue bumps." Among other things, the Company imposed new and unrealistic sales quotas, which it motivated employees to satisfy by improperly "upcoding" patient transactions to obtain higher reimbursements from insurers for life-saving diabetes devices. For instance, based on Medicaid claims data from around the United States, the Company used improper codes to bill insurance companies for a substantial majority of claims for diabetes supplies. Indeed, the Louisiana Attorney General opened a criminal investigation into the

[2] CGMs are devices used to automatically estimate an individual's blood glucose level, otherwise known as blood sugar.

Company for its billing practices. There, claims data showed that the Company used improper codes in *ninety-seven percent* of its reimbursement claims.

6. Moreover, as detailed herein, the Company encouraged employees to engage in other illicit practices to meet unrealistic sales quotas. For instance, when claims for reimbursement did not satisfy documentation requirements, employees altered doctors' prescriptions and notes to achieve the sale. According to former employees at Pinnacle Medical Solutions ("Pinnacle"), one of the Company's other large acquisitions, as much as fifty percent of all shipments were to patients who did not have proper paperwork or who did not meet the requirements for insurance coverage. Additionally, Company employees frequently sent patients unwanted medical supplies and equipment, depleting patients' insurance coverage, or auto-billing patients' credit cards without consent if insurance companies refused to pay. As a result of these actions, customer complaints increased substantially, resulting in patient attrition and decreased sales growth.

7. Critically, as detailed herein, according to former employees of AdaptHealth and its acquired companies, the Company's integration efforts did not actually begin for months—or even years—after an acquisition was completed, despite Company officers' statements to the contrary.

8. As a result of these illicit billing practices, the Company's revenue was artificially inflated. Because the Company calculated its revenue based on what the Company sought to receive in reimbursements from insurers and not revenue the Company has actually received, AdaptHealth used illicit billing practices, such as upcoding, and shipped unwanted and unordered products to patients, to report higher revenue numbers quarter after quarter—without any regard as to whether the Company would actually realize the inflated numbers that it reported.

9. The truth began to emerge on March 1, 2022, when the Company filed its annual

report for 2021 on a Form 10-K with the SEC (the "2021 10-K), wherein AdaptHealth admitted that the Company suffered from materially ineffective "process level controls" in "***substantially all processes*** that support our financial statements and reporting."[3] This would have included the auditing and billing processes that the Company had touted as a strength.

10. On this news, the Company's stock price fell $2.15 per share, or approximately 12.3%, to close at $15.28 per share on March 2, 2022.

11. Thereafter, the Individual Defendants continued to mislead investors and the public by assuring them that these weaknesses were limited, and announcing that the Company had significant new technological developments that would purportedly remediate these weaknesses.

12. Then, on February 27, 2023, the Company issued a press release announcing its financial results for the fourth quarter and full-year 2022 (the "4Q22 Earnings Release") and revealed that the Company had experienced a loss of $0.02 per share for the fourth quarter of 2022. Additionally, in the 4Q22 Earnings Release, AdaptHealth reported 2022 adjusted EBITDA of $40 million below guidance, and total 2022 net revenue of $50 million below guidance, with almost all of the revenue growth from 2021 coming from acquisitions and only 3.5% from "non-acquired growth." Then-CEO Defendant Griggs revealed that "[a]djusted EBITDA fell short of our full year guidance due primarily to larger impacts from revenue mix and cost pressures than we previously expected." The Company also lowered its 2023 revenue guidance by more than 1.5 percent and its 2023 adjusted EBITDA by over 5.3 percent.

13. On news of these disappointing financial results, the price of AdaptHealth stock declined by $5.99 per share, or roughly 27%, to close at $15.99 per share on February 28, 2023.

14. On May 9, 2023, the truth continued to emerge when the Company announced its

[3] Emphasis is added unless otherwise noted.

financial results for the first quarter of 2023 (the "1Q23 Earnings Release"). In the 1Q23 Earnings Release, the Company reported net revenue of $744.6 million, which was only an increase of 5.4 percent, as well as "non-acquired" growth of only 4.7 percent. AdaptHealth further disclosed adjusted EBITDA of $134 million, 2.7 percent lower than the first quarter of 2022. Defendant Griggs was quoted in the 1Q23 Earnings Release as stating that "a decline in our Diabetes business, largely driven by the pump and supplies categories" hurt growth. AdaptHealth further announced that Griggs would be stepping down as CEO of the Company.

15. On this news, the Company's stock price fell $0.77 per share, or approximately 6.4%, to close at $11.30 per share on May 9, 2023.

16. Then, on November 7, 2023, the full truth finally emerged when the Company issued a press release announcing its financial results for the fourth quarter of 2023 (the "4Q23 Earnings Release") and revealed that AdaptHealth had a net loss of $454.1 million, "largely resulting from a $511.9 million pre-tax write down of goodwill." The quarterly report filed on a Form 10-Q with the SEC on the same day (the "4Q23 10-Q") revealed that the impairment was triggered by the Company's declining stock price and also listed factors that impacted the Company's operating results, which included AdaptHealth's lack of ability to execute on the integration of its acquisitions. Specifically, the 4Q23 10-Q stated in relevant part, that "[t]he Company has a significant amount of goodwill on its balance sheet that resulted from the ***business acquisitions the Company has made***." Accordingly, the value of the Company's goodwill was significantly dependent upon its ability to successfully integrate the acquired companies into the Company's operations. As a result, AdaptHealth's failure to integrate its acquisitions negatively impacted its financial results.

17. On this news, the Company's stock price fell $1.35 per share, or approximately

16%, to close at $7.69 per share on November 7, 2023. The Company's stock price continued to decline the following day, closing at $6.50 per share on November 8, 2023.

18. As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) the Company had misstated its ability to generate and sustain organic growth in its diabetes segment; (ii) the Company had engaged in illicit billing practices in seeking reimbursement from insurance companies; (iii) the risks to the Company related to engaging in overbilling as a result of "coding errors" were not merely hypothetical and had already materialized; (iv) the Company was not effectively or timely integrating its acquired companies; (v) the Company failed to maintain proper internal controls over its operations and financial and public reporting; and (vi) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

19. Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase nearly three million shares of its own stock at prices that were artificially inflated due to the Individual Defendants' materially false and misleading statements detailed herein.

20. As a direct and proximate result of the misconduct detailed herein, the Company has incurred significant financial losses, including the cost of defending itself and, potentially, incurring class-wide damages in the Securities Class Action, as well as additional losses in market capitalization, reputational harm and the loss of goodwill.

21. Moreover, in light of the breaches of fiduciary duty by the Individual Defendants,

most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), and Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)).

23. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

25. In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

26. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and

28 U.S.C. §1391 because the Company is headquartered in this District, Defendants conduct business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## PARTIES

***Plaintiff***

27. Plaintiff is, and has been at all relevant times, a continuous shareholder of AdaptHealth common stock.

***Nominal Defendant***

28. Nominal Defendant AdaptHealth is incorporated under the laws of the State of Delaware and maintains its principal executive offices at 220 West Germantown Pike, Suite 250, Plymouth Meeting, Pennsylvania 19462. AdaptHealth's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "AHCO."

***Individual Defendants***

29. Defendant Barasch served as Chairman of the Board from 2019 until July 2024 and as interim CEO of the Company from July 2023 until May 2024. Barasch also previously served as CEO and President of DFB Healthcare Acquisitions Corp. ("DFB"), the Company's predecessor. According to the Company's public filings, Defendant Barasch received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2020 | $251,733 |
| 2021 | $250,268 |
| 2022 | $370,762 |

| | |
|---|---|
| 2023 | $2,265,183 |

30. Defendant McGee served as CEO and as a director of the Company from March 2019 until June 2021. According to the Company's public filings, Defendant McGee received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2020 | $1,009,533 |
| 2021 | $8,061,871 |

31. Defendant Griggs served as CEO of the Company from June 2021 until June 2023. Prior to this, Defendant Griggs served as the Company's Co-CEO from February 2021 to June 2021. According to the Company's public filings, Defendant Griggs received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2021 | $3,935,883 |
| 2022 | $4,724,344 |
| 2023 | $10,437,819 |

32. Defendant Clemens has served as Chief Financial Officer ("CFO") of the Company since August 2020. According to the Company's public filings, Defendant Clemens received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2020 | $1,603,618 |
| 2021 | $2,820,707 |
| 2022 | $2,577,400 |
| 2023 | $2,383,415 |

33. Defendant Rietkerk served as Chief Operating Officer ("COO") of the Company from March 2023 until January 2025. Prior to this, Rietkerk served as Chief Revenue Officer of the Company from November 2019 until August 2020, as COO of the Company from August 2020

until February 2021, and as COO – Centralized Operations of the Company from February 2021 until March 2023. According to the Company's public filings, Defendant Rietkerk received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2023 | $1,529,264 |

34. Defendant Russalesi has served as the Chief Compliance Officer ("CCO") of the Company since September 2014. The Company did not publicly disclose Defendant Russalesi's compensation during the Relevant Period.

35. Defendant Carson has served as President and COO, Diabetes of the Company from February 2021 until February 2024. Prior to this, Defendant Carson served as President of AdaptHealth Patient Care Solutions from January 2020 until February 2021. The Company did not publicly disclose Defendant Carson's compensation during the Relevant Period.

36. Defendant Mullen served as Chief Accounting Officer ("CAO") of the Company from September 2020 until May 2022. The Company did not publicly disclose Defendant Mullen's compensation during the Relevant Period. During the Relevant Period, on September 23, 2021, Defendant Mullen made an insider sale of AdaptHealth common stock while the stock price was artificially inflated, selling 945 shares at a price of $23.52 per share, netting proceeds of approximately $22,226.

37. Defendant Belinfanti has served as a director of the Company since September 2021. Belinfanti also serves as a member of the Company's Compensation Committee and the Corporate Compliance and Governance Committee (the "Governance Committee").[4] According to the Company's public filings, Defendant Belinfanti received the following compensation from

[4] The Company's "Nominating and Governance Committee" was renamed the "Corporate Compliance and Governance Committee" in 2024.

the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2021 | $125,145 |
| 2022 | $269,532 |
| 2023 | $277,576 |

38. Defendant Connors has served as a director of the Company since July 2019. Connors also serves as Chairperson of the Company's Audit Committee and as a member of the Company's Governance Committee. According to the Company's public filings, Defendant Connors received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2020 | $200,866 |
| 2021 | $200,145 |
| 2022 | $304,532 |
| 2023 | $307,576 |

39. Defendant Coppens has served as a director of the since July 2020. Coppens also serves as Chairperson of the Company's Compensation Committee and as a member of the Company's Audit Committee. According to the Company's public filings, Defendant Coppens received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2020 | $125,866 |
| 2021 | $175,153 |
| 2022 | $297,282 |
| 2023 | $306,674 |

40. Defendant Lundberg has served as a director of the Company since February 2021. Lundberg also serves as a member of the Company's Audit Committee and Governance Committee. According to the Company's public filings, Defendant Lundberg received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|

| | |
|---|---|
| 2021 | $137,645 |
| 2022 | $277,032 |
| 2023 | $287,576 |

41. Defendant Parnes served as President of the Company from July 2019 until August 2024 and as a director of the Company from July 2019 until December 2024.. According to the Company's public filings, Defendant Parnes received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2020 | $1,000,489 |
| 2021 | $3,977,930 |
| 2022 | $4,740,940 |
| 2023 | $4,051,084 |

42. Defendant Weaver has served as a director of the Company since February 2018. Weaver also serves as a member of the Company's Compensation Committee and Governance Committee. According to the Company's public filings, Defendant Weaver received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2020 | $175,866 |
| 2021 | $175,145 |
| 2022 | $283,282 |
| 2023 | $287,576 |

43. Defendant Williams has served as a director of the Company since July 2020. Williams also serves as a member of the Company's Compensation Committee and Governance Committee. According to the Company's public filings, Defendant Williams received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2020 | $125,866 |
| 2021 | $150,145 |
| 2022 | $269,532 |
| 2023 | $277,576 |

44. Defendant Wolf has served as a director of the Company since July 2019 and as Chair of the Board since July 2024. Wolf also serves as a member of the Company's Audit Committee. According to the Company's public filings, Defendant Wolf received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2020 | $150,866 |
| 2021 | $150,145 |
| 2022 | $284,532 |
| 2023 | $297,576 |

45. Defendant Quasha served as a director of the Company from July 2019 until September 2021. According to the Company's public filings, Defendant Quasha received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2020 | $176,077 |
| 2021 | $25,000 |

***Relevant Non-Parties***

46. This action is based on Plaintiff's review, by and through his counsel, of an extensive record of public documents, including the Amended Class Action Complaint for Violations of the Federal Securities Laws filed in the Securities Class Action (ECF No. 59) (the "Amended Complaint"), which contains detailed allegations based on interviews with fifteen former employees ("FEs") at AdaptHealth and its acquired businesses who provided information to plaintiffs' counsel in the Securities Class Action supporting the allegations in that case. These FEs provided information on a confidential basis and were described in the Amended Complaint with sufficient detail to establish their reliability and personal knowledge.

47. FE 1 was a Human Resource Business Partner at Solara and then AdaptHealth (after

the acquisition) from July 2018 until August 2023. FE 1 oversaw human resources for the Company's diabetes division, which consisted of approximately 1,000 employees, and as part of her duties, handled formal complaints from employees and communicated them to corporate executives who regularly met with AdaptHealth's executive officers.

48. FE 2 was a Location Manager at Solara's Michigan location from September 2019 until September 2021. FE 2 was responsible for all aspects of the diabetes supply business, including customer service, patient intake, inside sales (*i.e.*, resupply sales), and shipping. FE 2 met at least weekly with executives, including Regional Vice President of Operations Jim Vainio ("Vainio"), and Vice President of Inside Sales Hector Mendoza ("Mendoza").

49. FE 3 worked as an Intake and Inside Sales Specialist and team leader at Pinnacle and then AdaptHealth from March 2019 until April 2023. FE 3 regularly met at least once a week with her boss, Senior Manager 1, and Vainio, to discuss revenue goals and sales targets.

50. FE 4 was a Diabetes Care Specialist at Pinnacle and then AdaptHealth from July 2020 until July 2021. FE 4 was responsible for contacting patients and placing resupply orders for diabetes testing equipment.

51. FE 5 worked as an Inside Sales Specialist at Pinnacle and then AdaptHealth from July 2019 until July 2022. FE 5 worked on intake and resupply orders and verified proper documentation for shipping.

52. FE 6 was a Billing Clerk at AeroCare Holdings, Inc. ("AeroCare") and then AdaptHealth from May 2021 until February 2022.

53. FE 7 worked as a Reimbursement Manager at AdaptHealth from June 2018 until April 2021. FE 7 covered the region of North Carolina, South Carolina, Virigina, Florida, and parts of Texas, and managed a team of approximately thirty specialists who reviewed and addressed

problems with claims.

54. FE 8 was an Inside Sales Specialist at Solara and then AdaptHealth from November 2020 until August 2021. FE 8 was responsible for setting up orders in Solara's Salesforce System.

55. FE 9 was a Senior Manager of Patient Acquisitions at Solara and then AdaptHealth from June 2019 until October 2022.

56. FE 10 worked at AdaptHealth from January 2018 until June 2021 as a Director of Training & Implementation, Operations.

57. FE 11 worked as a CGM Sales Manager at Pumps It, Inc. ("Pumps It") and then AdaptHealth from February 2019 until June 2022.

58. FE 12 was a Quality Assurance specialist who worked at Solara and then AdaptHealth from August 2018 until January 2022.

59. FE 13 was a high-level executive who worked at Pumps It and then AdaptHealth from August 20212 until October 2022. FE 13 was the supervisor of FE 11.

60. FE 14 was a Senior PAP Specialist at AeroCare and then AdaptHealth from May 2017 until January 2024.

61. FE 15 was an account executive at Diabetes Supply Company and then AdaptHealth. From April 2022 until January 2024, FE 15 visited clinics in Nebraska, Iowa, and South Dakota on behalf of AdaptHealth.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

62. Because of their positions as officers and/or directors of AdaptHealth, and their ability to control the business and corporate affairs of the Company, the Individual Defendants owed AdaptHealth and its shareholders fiduciary obligations of good faith, loyalty, trust, and candor and were required to use their utmost ability to control and manage the Company in a fair,

just, honest, and equitable manner at all relevant times.

63. Therefore, the Individual Defendants were required to act in furtherance of the best interests of AdaptHealth and its shareholders.

64. Each director and officer of the Company owes to AdaptHealth and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

65. The Individual Defendants, because of their positions of control and authority as directors and/or officers of AdaptHealth, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

66. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of trust, loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of AdaptHealth, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

67. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company’s financial condition, performance, growth, financial statements, earnings, internal controls, and present and future

business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

68. To discharge their duties, the officers and directors of AdaptHealth were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of AdaptHealth were required to, among other things:

(a) Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Pennsylvania and the United States, and pursuant to AdaptHealth's own Code of Ethics and Business Conduct (the "Code of Conduct");

(b) Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) Remain informed as to how AdaptHealth conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) Establish and maintain systematic and accurate records and reports of the business and internal affairs of AdaptHealth and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that AdaptHealth's operations would comply with all applicable laws and AdaptHealth's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above;

69. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by AdaptHealth.

70. At all times relevant hereto, the Individual Defendants were the agents of each other and of AdaptHealth and were at all times acting within the course and scope of such agency.

71. Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

72. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

73. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

74. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

75. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of AdaptHealth, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

76. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

77. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of AdaptHealth and at all times acted within the course and scope of such agency.

## ADAPTHEALTH'S CODE OF CONDUCT

78. According to the Code of Conduct, the Code of Conduct "reinforces the Company's commitment to the highest ethical and legal standards and provides each employee, officer, and director of the Company . . . with guidance and perspective in understanding business ethics as AdaptHealth."

79. In a section titled "Compliance with All Laws & Regulations," the Code of Conduct states:

> All AdaptHealth Covered Persons are required to comply with all federal, state, and local laws and regulations. In addition, all Covered Persons are subject to the Company's Insider Trading Policy relating to transactions in the Company's securities and the securities of other companies. Covered Persons are obligated to report any actual or perceived violation of any applicable law or regulation, this Code, the Corporate Compliance Program, the Insider Trading Policy or any other AdaptHealth policy through the appropriate channels provided under the heading "How to File a Report" in this Code.

80. In a section titled "Financial Integrity," the Code of Conduct states:

> **Business Financial Recording** – AdaptHealth requires honest and accurate recording and reporting of financial information in order to make responsible business decisions. All financial books, records and accounts must accurately reflect transactions and events and conform to generally accepted accounting principles and to AdaptHealth's system of internal controls. It is the policy of the Company to provide full, fair, accurate, timely and understandable disclosure in reports and documents filed with, or submitted to, the SEC and in other public communications.

81. In a section titled "Avoiding Abuses of Trust," the Code of Conduct states, in relevant part:

> AdaptHealth expects its Covered Persons not to engage in any activity that might interfere, detract, or conflict, or appear to interfere, detract, or conflict, with AdaptHealth's best interest or the interests of AdaptHealth's customers or suppliers.

**Conflicts of Interest** – All Covered Persons have a responsibility to avoid situations and relationships that involve actual or potential conflicts of interest. Generally, a conflict of interest arises whenever a Covered Person's personal interests diverge from his or her responsibilities to AdaptHealth or from AdaptHealth's best interests. Put another way, a conflict of interest is created whenever an activity, association, or relationship of a Covered Person might impair independent exercise of judgment in the Company's best interest.

**Personal Conflicts of Interest** – Direct reporting or co-working relationships involving relatives or significant others in any capacity, whether by contract or through an outside service agency, may create conflicts of interest potentially harmful to both the Company and the Covered Persons involved and are generally discouraged. These situations, and others like them, where loyalties to AdaptHealth could be compromised, must be avoided. Covered Persons who believe they are involved in a potential conflict of interest have a responsibility to discuss it with their supervisor or the Legal Department. . . .

**Insider Trading** – "Insider trading" refers generally to buying or selling a security, in breach of a fiduciary duty or other relationship of trust and confidence, while in possession of material, nonpublic information about the security. Insider trading violations may also include "tipping" such information, securities trading by the person "tipped," and securities trading by those who misappropriate such information.

The scope of insider trading violations can be wide- reaching. The Securities and Exchange Commission (the "SEC") has brought insider trading cases against corporate officers, directors, and employees who traded the corporation's securities after learning of significant, confidential corporate developments; friends, business associates, family members, and other "tippees" of such officers, directors, and employees who traded the securities after receiving such information; employees of law, banking, brokerage, and printing firms who were given such information in order to provide services to the corporation whose securities they traded; government employees who learned of such information because of their employment by the government; and other persons who misappropriated and took advantage of, confidential information from their employers.

An "insider" can include officers, directors, major stockholders, and employees of an entity whose securities are publicly traded. In general, an insider must not engage in transactions in the securities of that entity for personal gain if that person possesses material, nonpublic information about the entity. In addition, an insider who is aware of material, nonpublic information must not disclose such information to family, friends, business or social acquaintances, employees, or independent contractors of the entity (unless such employees or independent contractors have a position within the entity giving them a clear right and need to know and a duty to keep such information strictly confidential), and other third parties.

## ADAPTHEALTH'S AUDIT COMMITTEE CHARTER

82. Under the section titled "Purpose," the Company's Audit Committee Charter states

that:

> The Committee is appointed by the Board for the primary purposes of performing the Board's oversight responsibilities as they relate to the Company's accounting policies and internal controls, financial reporting practices and legal and regulatory compliance, including, among other things:
>
> - the quality and integrity of the Company's financial statements;
> - the Company's compliance with legal and regulatory requirements;
> - review of the independent registered public accounting firm's qualifications and independence;
> - the performance of the Company's internal audit function and the Company's independent registered public accounting firm;
> - maintaining, through regularly scheduled meetings, a line of communication between the Board and the Company's financial management, internal auditors and independent registered public accounting firm, including providing such parties with appropriate opportunities to meet separately and privately with the Committee on a periodic basis; and
> - preparing the report to be included in the Company's annual proxy statement, as required by SEC rules.

83. Under a section titled "Duties and Responsibilities," the Audit Committee Charter tasks the Audit Committee with the following duties and responsibilities:

> (a) Review and discuss the annual audited financial statements and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" with management and the independent registered public accounting firm. In connection with such review, the Committee will:
>
> - Discuss with the independent registered public accounting firm the matters required to be discussed by all applicable auditing standards (as may be modified or supplemented) and the matters in the written disclosures required by the applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the Committee concerning independence;
> - Review significant changes in accounting policies or auditing procedures;

- Review with the independent registered public accounting firm any problems or difficulties encountered in the course of their audit, including any change in the scope of the planned audit work and any restrictions placed on the scope of such work and management's response to such problems or difficulties;

- Review with the independent registered public accounting firm, management and the internal auditors the adequacy of the Company's internal control over financial reporting, and any significant findings and recommendations with respect to such controls; Review reports required to be submitted by the independent registered public accounting firm concerning: (a) all critical accounting policies and practices used; (b) all alternative treatments of financial information within generally accepted accounting principles ("GAAP") that have been discussed with management, the ramifications of such alternatives, and the accounting treatment preferred by the independent registered public accounting firm; (c) any other material written communications with management; and (d) any material financial arrangements of the Company which do not appear within the financial statements of the Company;

- Review (a) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal control over financial reporting and any special audit steps adopted in light of any significant deficiencies or material weaknesses in such controls; and (b) analyses prepared by management and/or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analysis of the effects of alternative GAAP methods on the financial statements and the effects of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; and

- Discuss policies and procedures concerning earnings press releases and review the type and presentation of information to be included in earnings press releases (paying particular attention to any use of "pro forma" or "adjusted" non-GAAP information), as well as financial information and earnings guidance provided to analysts and rating agencies.

(b) Review and discuss the quarterly financial statements and the Company's disclosures provided in periodic quarterly reports including "Management's Discussion and Analysis of Financial Condition and Results of Operations" with management, the internal auditors and the independent registered public accounting firm.

(c) Review and discuss with the General Counsel, Chief Compliance Officer, and/or any other senior-level management representative, as the Committee deems necessary, the accuracy of public disclosures with respect to material investigations involving the Company's officers and directors that are required to be disclosed under state and/or federal laws and regulations (if any).

(d) Oversee the external audit coverage. The Company's independent registered public accounting firm is ultimately accountable to the Committee, which has the direct authority and responsibility to appoint, retain, compensate, terminate, select, evaluate and, where appropriate, replace the independent registered public accounting firm. In connection with its oversight of the external audit coverage, the Committee will have authority to:

- Appoint and replace (subject to stockholder approval, if deemed advisable by the Board) the independent registered public accounting firm;

- Approve the engagement letter and the fees to be paid to the independent registered public accounting firm;

- Pre-approve all audit and non-audit services to be performed by the independent registered public accounting firm and the related fees for such services other than prohibited nonauditing services as promulgated under rules and regulations of the SEC (subject to the inadvertent de-minimis exceptions set forth in the Act and the SEC rules) and establish pre-approval policies and procedures;

- Monitor and obtain confirmation and assurance as to the independent registered public accounting firm's independence, including ensuring that they submit on a periodic basis (not less than annually) to the Committee a formal written statement delineating all relationships between the independent registered public accounting firm and the Company consistent with the Public Company Accounting Oversight Board Rule 3526. The Committee is responsible for actively engaging in a dialogue with the independent registered public accounting firm with respect to any disclosed relationships or services that may impact the objectivity and independence of the independent registered public accounting firm and for taking appropriate action in response to the independent registered public accounting firm's report to satisfy itself of their independence;

- At least annually, obtain and review a report by the independent registered public accounting firm describing: the firm's internal quality-control procedures; any material issues raised by the most recent internal quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and to assess the independent registered public accounting firm independence, all

relationships between the independent registered public accounting firm and the Company;

- Meet with the independent registered public accounting firm prior to the annual audit to discuss planning and staffing of the audit;

- Review and evaluate the performance of the independent registered public accounting firm, as the basis for a decision to reappoint or replace the independent registered public accounting firm;

- Set clear hiring policies for employees or former employees of the independent registered public accounting firm, including but not limited to, as required by all applicable laws and listing rules;

- Set clear policies for audit partner rotation in compliance with applicable laws and regulations; and

- Assure regular rotation of the lead (or coordinating) audit partner having primary responsibility for the audit and the audit partner responsible for reviewing the audit, as required by the Act, and consider whether rotation of the independent registered public accounting firm is required to ensure independence.

- Take, or recommend that the Board take, appropriate action to oversee the independence of the Company's independent registered public accounting firm; and

- Monitor compliance by the Company of the employee conflict of interest requirements contained in the Act and the rules and regulations promulgated by the SEC thereunder.

(e) Oversee internal audit activities. In connection with its oversight responsibilities, the Committee will:

- Review the appointment or replacement of the internal auditors;

- Review, in consultation with management, the independent auditors and the internal auditors, the plan and scope of internal audit activities, and, when deemed necessary or appropriate by the Committee, assign additional internal audit projects to appropriate personnel;

- Review the Committee's level of involvement and interaction with the Company's internal audit function, including the Committee's line of authority and role in appointing and compensating employees (or outsourced third parties) in the internal audit function;

- Review internal audit activities, budget, compensation and staffing; and

- Review significant reports to management prepared by the internal auditing function and management's responses to such reports.

(f) Receive periodic reports from the Company's independent registered public accounting firm, management and the Company's internal auditors to assess the impact on the Company of significant accounting or financial reporting developments that may have a bearing on the Company.

(g) Review with the independent registered public accounting firm and the internal auditors the adequacy and effectiveness of the Company's accounting and internal control policies and procedures and any significant findings and recommendations with respect to such controls.

(h) Review with the Chief Executive Officer, Chief Financial Officer and independent registered public accounting firm, periodically, the following:

- all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

- any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

(i) Resolve any differences in financial reporting between management and the independent registered public accounting firm.

(j) Establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and (ii) the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

(k) Establish procedures for the receipt, retention and treatment of reports of evidence of a material violation made by attorneys appearing and practicing before the SEC in the representation of the Company or any of its subsidiaries, or reports made by the Company's co-chief executive officers in relation thereto.

(l) Discuss policies and guidelines to govern the process by which risk assessment and risk management is undertaken.

(m) Meet periodically with management to review and assess the Company's major financial risk exposures and the manner in which such risks are being monitored and controlled.

(n) Consider and review, at least annually, with the Chief Technology Officer and the internal auditors the adequacy and effectiveness of the Company's monitoring of and system of internal controls over cybersecurity matters, including data and privacy protection policies and programs. Discuss with the Chief Technology Officer any significant cybersecurity incidents or risk exposures that have come to management's attention during the conduct of their assessments and the steps management has taken to mitigate such exposures.

(o) Meet periodically (not less than annually) in separate executive session with each of the Chief Financial Officer, the internal auditors, and the independent registered public accounting firm.

(p) Review and approve all "related party transactions" requiring disclosure under SEC Regulation S-K, Item 404, in accordance with the policy set forth in Section 6 below.

(q) Review the Company's policies relating to the ethical handling of conflicts of interest and review past or proposed transactions between the Company and members of management as well as policies and procedures with respect to officers' expense accounts and perquisites, including the use of corporate assets. The Committee shall consider the results of any review of these policies and procedures by the Company's internal auditors or independent registered public accounting firm.

(r) Review and approve in advance any services provided by the Company's independent registered public accounting firm to the Company's executive officers or members of their immediate family.

(s) Review the Company's program to monitor compliance with the Company's Code of Conduct and meet periodically with the Company's Compliance Committee to discuss compliance with the Code of Conduct.

(t) As it determines necessary to carry out its duties, engage and obtain advice and assistance from outside legal, accounting or other advisers, the cost of such independent experts and/or advisors to be borne by the Company.

(u) Report regularly to the Board with respect to Committee activities.

(v) Prepare the report of the Committee required by the rules of the SEC to be included in the proxy statement for each annual meeting.

(w) Review and reassess annually the adequacy of this Charter and recommend any proposed changes to the Board.

(x) Review with management, the independent registered accounting firm, and the Company's legal advisors, as appropriate, any legal, regulatory or compliance matters, including any correspondence with regulators or government agencies and any employee complaints or published reports that raise material

> issues regarding our financial statements or accounting policies and any significant changes in accounting standards or rules promulgated by the Financial Accounting Standards Board, the SEC or other regulatory authorities.
>
> (y) Inquire and discuss with management the Company's compliance with applicable laws and regulations.
>
> (z) Determine the compensation and oversight of the work of the independent registered public accounting firm (including resolution of disagreements between management and the independent registered public accounting firm regarding financial reporting) for the purpose of preparing or issuing an audit report or related work.

## **SUBSTANTIVE ALLEGATIONS**

### *Company Background*

84. AdaptHealth is purportedly a national leader in providing patient-centered, healthcare-at-home solutions, including HME, medical supplies, and related services. The Company provides a full suite of medical products and solutions designed to help patients manage chronic conditions in the home, adapt to challenges in their activities of daily living, and thrive.

85. The Company's product and service offerings include: (i) sleep therapy equipment, supplies, and related services, including CPAP and bi PAP services, to individuals suffering from obstructive sleep apnea; (ii) medical devices and supplies to patients for the treatment of diabetes, including continuous glucose monitors and insulin pumps; (iii) HME to patients discharged from acute care and other facilities; (iv) oxygen and related chronic therapy services in the home; and (v) other HME devices and supplies on behalf of chronically ill patients with wound care, urological, incontinence, ostomy, and nutritional supply needs. The Company partners with an extensive and diversified network of referral sources, including acute care hospitals, sleep labs, pulmonologists, skilled nursing facilities, and clinics.

86. AdaptHealth conducts business with both private and insurance providers and public insurance providers, such as Centers for Medicare and Medicaid Services ("CMS"),

reaching approximately 4.2 million patients annually in all fifty states through its network of approximately 670 locations in forty-seven states. Through AdaptHealth's business model, the Company sells directly to patients and bills the patients' insurance providers to receive reimbursements.

***The Company's Acquisition Strategy***

87. During the Relevant Period, the Company employed a strategy of acquiring and purportedly integrating numerous HME suppliers, particularly in growth industries such as diabetes monitoring devices and sleep aid machines. For instance, on July 2, 2020, AdaptHealth completed its $487 million acquisition of Solara, which, at the time, was the largest independent distributor of CGMs, devices used to automatically estimate an individual's blood glucose level.

88. Additional acquisitions by the Company included, among others: (i) its December 2020 acquisition of AeroCare, a respiratory and home medical equipment distribution platform; (ii) its October 2020 acquisition of Pinnacle, a major distributor of diabetes medical devices, including insulin pumps and CGMs; and (iii) its September 2021 acquisition of Pumps It, a distributor of insulin infusion pumps and related supplies.

89. Throughout the Relevant Period, the Individual Defendants repeatedly misled investors by assuring them that the Company was quickly and effectively integrating its acquired companies, and that this strategy was creating sustainable growth for AdaptHealth.

90. However, in reality, as detailed herein, the Company failed to properly integrate its acquired companies into AdaptHealth.

91. Nevertheless, despite the Company's failure to properly integrate its acquired companies, the Company rewarded its executives with exorbitant compensation for the purported success of its acquisition strategy. For instance, Defendant McGee received a bonus of $2 million

for closing the AeroCare acquisition. Moreover, in connection with the AeroCare acquisition, more than eighty employees, including Defendants Clemens, Griggs, and Parnes, received substantial bonuses. Defendants Clemens, Griggs, and Parnes received hundreds of thousands of dollars in additional cash and equity compensation in connection with the AeroCare acquisition.

***AdaptHealth's Illicit Billing Practices***

92. Throughout the Relevant Period, the Company engaged in improper and unethical tactics to inflate sales numbers, including using improper billing codes, submitting claims without proper documentation, altering doctor prescriptions, and shipping unwanted and unnecessary equipment. Indeed, CMS even issued suspension notices to two AdaptHealth businesses based on its determination that they "had billed for services which were not rendered and/or were medically unnecessary, and improperly solicited beneficiaries."

93. The Company incentivized these illicit billing practices by imposing onerous sales quotas and offering enormous perks to managers to meet the quotas. Simultaneously, the Company removed compliance measures that would have prevented these improper practices from taking place.

***A. The Company Knowingly Used Incorrect Billing Codes to Drive Up Revenue***

94. Through AdaptHealth's business model, the Company sells directly to patients and bills the patients' insurance providers to receive reimbursements. Accurate medical billing and proper coding, including the Healthcare Common Procedure Coding System ("HCPCS"), are essential for reimbursement. HCPCS provides a standardized coding system for describing the specific items and services provided in healthcare and dictates the billing codes in the claims that

physicians, healthcare providers and suppliers, like AdaptHealth, submit to CMS.[5]

95. As a substantial amount of AdaptHealth's revenues purportedly comes from CMS, the Company was required to comply with all regulatory practices and programs surrounding CMS, including HCPCS.

96. Of particular importance to AdaptHealth, depending on the technology involved, HCPCS provides that diabetes devices are billed using either "A-codes" or "K-codes." Older versions of CGMs, which require patients to utilize a monthly supply of finger pricks with a stand-alone transmitter in monitor, are billed using A-codes and qualify for monthly reimbursements of $400, in addition to a one-time sensor reimbursement ranging from $900 to $1,200. In contrast, the newer versions of CGMs, which are in the form of a single small device with the transmitter, monitor, and sensor bundled into the same device to be continuously worn by the patient without the need for fingerprints, are billed using K-codes and qualify for much lower monthly reimbursements, ranging from $250 to $270.

97. As a matter of course, after the provider or supplier submits the claims to CMS, CMS then begins processing the claim and, if the correct documents were submitted, distributes payment to AdaptHealth based on rates and coverage policies. If applicable, AdaptHealth will bill the patient for any required co-pays or deductible.

98. When the Company reports its revenue to investors (and evaluates revenue for purposes of employee bonuses), the revenue number that the Company uses is an estimate calculated based on the revenue that it sought to receive from reimbursements—even if those claims are later rejected and AdaptHealth does not actually ever receive the reimbursements. The

---

[5] *See Healthcare Common Procedure Coding System (HCPCS)*, U.S. Centers for Medicare & Medicaid Services (Nov. 18, 2025), https://www.cms.gov/medicare/coding-billing/healthcare-common-procedure-system.

Company bases its expected reimbursement revenue on fee schedules from insurers, including the HCPCS system. Accordingly, billing pursuant to the proper codes is crucial.

99. However, despite assuring investors that the change to guidelines for billing CGM devices as "K-codes," rather than more profitable "A-codes," was "nothing that we're concerned about whatsoever" and that compliance risks were "nothing that keeps [us] up at night," the Company was experiencing a decrease in profits and engaged in an illicit billing scheme to cover it up.

100. [redacted]

101. [redacted]

6 [redacted]

[redacted]

102. [redacted]

103. Rather than reveal these issues to investors, the Individual Defendants engaged in an illicit billing scheme to create the look of profits. Throughout the Relevant Period, as reported by former employees of AdaptHealth, the Company did not adhere to the appropriate fee schedules set by Medicare and Medicaid, but instead submitted reimbursement claims for CGMs using more expensive A-codes, inflating reimbursements amounts, thereby allowing AdaptHealth to report higher amounts of expected revenue to investors and allowing employees to hit their sales quotas and bonus targets. Then, when those claims were ultimately denied, AdaptHealth kept the revenue on their books by passing the bill to patients.

104. Company employees reported that AdaptHealth improperly coded its diabetes equipment to increase profits and failed to oversee billing practices. For instance, FE 2, a Solara employee who continued to work for AdaptHealth after Solara's acquisition, recounted that the Company purposely upcoded its diabetes equipment "to get paid more," and that when AdaptHealth took over Solara, it "gutted everything" and maintained no oversight of billing codes,

---

7 [redacted]

thereby allowing employees to "put in whatever they wanted" to hit their sales numbers. AC ¶ 100.[8] FE 2 further stated that AdaptHealth's higher ups, including Mendoza and Vanio, would instruct employees about which codes generated the most revenue, regardless of whether it was the appropriate code to report. *Id.*

105. FE 8, another former Solara worker who then worked at AdaptHealth, confirmed that the Company "primarily" used A-codes rather than K-codes to bill for CGMs and that 70-80% of the orders he processed were billed as A-codes. *Id.* ¶ 101. FE 8 further alleged that the Company did not provide any formal training to employees regarding appropriate codes to use. *Id.* Instead, employees were simply told by supervisors which codes to use. *Id.*

106. Company management routinely ignored warnings from employees that AdaptHealth was engaged in upcoding and overbilling. For instance, FE 2, who served as a manager, stated that his employees pushed back about using improper codes at a weekly team meeting with management, and that the response from AdaptHealth higherups Vainio and Mendoza was "don't question us, don't challenge us." *Id.* ¶ 102. When FE 2 pushed back against the unrealistic sales goals, he was met with a similar response. *Id.*

107. Additional Company employees corroborated these allegations in an investigative report titled "AdaptHealth: Company Inflating Reimbursement from State Medicaid Programs Through Use of Inappropriate Billing Codes for Diabetes Supplies" published on November 3, 2022, by The Capitol Forum, an industry watchdog. Former Company employees told The Capital Forum how "the company pushed its newly acquired subsidiaries to use older and more expensive billing codes, known as 'A-codes' to bill for newer and cheaper CGMs, which should be billed

[8] "AC ¶ __" refers to allegations contained in the Amended Complaint filed in the Securities Class Action. Securities Class Action, ECF No. 59.

with 'K-codes.'" *Id.* ¶ 93.

108. The Capitol Forum also corroborated the former employees' statements through data. For instance, The Capitol Forum obtained Medicaid claims data from Louisiana which showed that out of the roughly 111,000 CGM claims submitted between July 2020 and November 2022, more than 107,000, or approximately 97% of these CGM claims, were submitted using A-codes rather than the correct K-codes. *Id.* ¶ 314. Data from Massachusetts, Nebraska, and Michigan also indicated that large numbers of CGM claims were improperly billed using A-codes. *Id.*

109. Nonetheless, the Individual Defendants did nothing to remedy these fraudulent practices and hid them from investors. Rather, they repeatedly assured them that the Company's unique technology platform would reduce fraud and billing errors.

110. Indeed, throughout the Relevant Period, the Company told investors that it was using its "technology platform" to identify and fulfill resupply needs, which the Company alleged efficiently and accurately billed patients, and provided an accurate and transparent audit record. The Individual Defendants alleged that its technology platform was superior to its competitors and was one of the Company's "Competitive Strengths." The Company also alleged that its technology allowed the Company to comply with healthcare regulations and deliver a better patient experience.

111. [redacted]

---

9 [redacted]

[redacted]

***B. The Company Shipped Unwanted and Unnecessary Supplies to Force Patients to Cover the Bill to Increase Revenue***

112. In addition to the fraudulent practices detailed above, the Company further engaged in illicit billing practices by shipping CGMs and monthly supplies to patients who had not ordered them, were not needed, and/or were not covered by insurance. According to former employees interviewed in the Securities Class Action, the Company had a policy to "batch bill" equipment and supplies to patients with credit card information on file, without first contacting the patients. AC ¶ 111.

113. For instance, according to FE 10 (a former Director of Training & Implementation, Operations at the Company), although Medicare and Medicaid patients should not have been asked for credit card information at all, the Company's official training instructed employees to withhold processing claims and life-saving equipment from Medicare and Medicaid patients and insist on credit card information. *Id.* The Company routinely "auto billed" and "batch ran" orders denied by insurance with cards on file without patient consent. *Id.* Accordingly, this practice allowed

AdaptHealth to auto bill Medicare and Medicaid patients' credit cards—without their consent—if their claims were denied by Medicare and/or Medicaid.

114. These practices were corroborated with former Company employees who spoke with The Capitol Forum. Indeed, a former Pinnacle employee told The Capital Forum that the Company directed employees to intentionally mislead Medicare patients about their obligations to pay for supplies upfront. *Id.* ¶ 112.

115. Additionally, according to former employees of Solara, AdaptHealth had a policy to continue to bill as much as possible to insurance even when a customer switched from AdaptHealth to a different supplier. Indeed, a former Solara salesperson told The Capitol Forum that "Medicare would only allow a certain number of sensors and monitors in a given time frame. If a patient switched to another equipment supplier, [we] would try to use that allotment before their new supplier could." *Id.* ¶ 114.

116. FE 12, a former Quality Assurance Specialist at Solara and then at AdaptHealth, alleged that many orders noted only "verbal consent," which resulted in many returned products because the patients had not actually ordered them, and that the Company maintained a regular practice of double billing patients who got their medical supplies from other providers (*i.e.*, AdaptHealth would receive patient leads from medical offices of patients who had already received medical equipment from other suppliers). *Id.* ¶ 116. FE 12 stated that she reported these issues to her supervisors who did nothing about the problems. *Id.*

117. FE 9, a Senior Manager of Patient Acquisition at Solara and then AdaptHealth, stated that, starting in March or April of 2021, Mendoza, AdaptHealth's Vice President of Inside Sales, directed employees to ship orders without proper patient authorization. *Id.* ¶ 117. FE 9 recounted that once a Medicare referral came into the Company's system, rather than having

employees contact the patient and get confirmation before shipping (which was the required practice), Mendoza allowed employees to ship the product if they simply attempted to contact the patient once and left a voicemail. *Id.* If patients called back to complain and try and send back the unwanted product, employees were instructed to pressure the patients to accept the order and tell them that the products were 100% covered by Medicare. *Id.* FE 9 stated that when he left the Company in October 2022, he filed a complaint with Medicare to alert them of AdaptHealth's fraudulent practices. *Id.*

118. FE 2, the head manager of Solara's Michigan location, stated that the Company sent text blasts to patients that were due for more supplies. Patients were to respond "yes" or "no" in response to the text. *Id.* ¶ 118. However, FE 2 alleged that AdaptHealth frequently sent supplies to patients even if they did not confirm via text that they wanted the supplies. *Id.* These claims were corroborated by a class action lawsuit brought in Florida by AdaptHealth customers who asked not to be contacted but were sent text messages and received robocalls from the Company without consent. The case was recently settled by the Company.[10]

119. FE 13, an executive at Pumps It and then AdaptHealth, alleged that the Company attempted to "stack" resupply orders at the end of 2022 so it could maximize the amount it could bill insurance. AC ¶ 119. Specifically, FE 13 recounted that Kevin Wood, AdaptHealth's Senior Vice President of Sales and Business Development, hatched a scheme to improperly load patients up with four months of supplies at the end of 2022 to boost revenue numbers, even though Wood knew that patients' insurance companies would ultimately reject these claims. *Id.* FE 13 explained that other Company executives were aware of the plan, including Vainio, and that the Company's executives knew that insurance companies were no longer allowing bulk shipments and would not

[10] *See DeSouza v. AeroCare Holdings LLC*, Case No. 6:22-cv-01047-RBD-LHP (M.D. Fla.)

cover these orders, but proceeded with the plan regardless. *Id.*

120. [redacted]

***C. AdaptHealth Falsified Medical Records and Shipped Orders Without Required Documentation to Increase Profits***

121. Former employees of the Company reported that the Company employed practices to alter doctor prescriptions and shipping unwanted and unnecessary equipment and supplies.

122. For instance, FE 5, a former Inside Sales Specialist at Pinnacle and then AdaptHealth from July 2019 until July 2022, alleged that prior to the AdaptHealth acquisition, Pinnacle had high review standards for orders and often went back to doctors to confirm the orders, but that after AdaptHealth took over, the Company was more focused on the speed of turning orders and not the quality. AC ¶ 121.

123. Notably, the Company encouraged employees to alter physician notes and prescriptions to make patients eligible for CGMs and other supplies in order to promote more orders. According to FE 5, because Medicare and Medicaid have strict documentation and eligibility requirements for CGMs and other diabetes supplies, including physician diagnosis of Type 1 diabetes and the number of times a day the patient is required to take insulin, AdaptHealth employees, including management, regularly altered physician notes and prescriptions to make patients eligible for products in order to hit the Company's unrealistic sales quotas. *Id.* ¶¶ 122-23.

FE 5 stated that 50% of the Company's diabetes patients did not qualify for CGMs under their insurance, but the Company altered the patient documents and billed the insurance anyways. FE 5 recounted that these practices were much more prominent after the AdaptHealth acquisition, and that she reported these issues to her supervisors to no avail. *Id.* ¶ 124.

124. Furthermore, the Company shipped and billed products without proper documentation. FE 3, an Inside Sales Specialist at Pinnacle and then AdaptHealth, who managed a team of specialists who checked required documents for orders, recounted that AdaptHealth routinely billed claims without paperwork. *Id.* ¶ 125. FE 3 explained that in the first few weeks of a billing month, the Company would put claims without paperwork on hold but would later bill the deficient claims if the Company's revenue goals were not met. *Id.*

125. FE 13, an executive at Pumps It and then AdaptHealth from August 2012 to October 2022, stated that after AdaptHealth's acquisition, Pumps It routinely shipped orders without proper documentation to hit certain quotas. *Id.* ¶ 126. FE 13 recounted that obtaining the proper documentation could cause delays to orders for weeks, so AdaptHealth would ship orders without proper documentation and/or doctor prescriptions. *Id.* Even though these orders would be denied by insurance because they did not have proper documentation or prescriptions, AdaptHealth managers encouraged these practices in order for these orders to show up on the Company's accounts receivables and make the Company's financials look better than they actually were. *Id.*

126. Employees from Solara confirmed similar practices. Indeed, FE 12, a former Quality Assurance specialist at Solara and then AdaptHealth from August 2018 until January 2022, confirmed that as many as 25% of orders were shipped to patients who did not qualify for coverage because they did not have the required paperwork. *Id.* ¶ 127. According to FE 12, in order to achieve unrealistic sales goals, employees routinely qualified patients that did not have proper

chart notes based on a pandemic-era loophole that relaxed certain doctor visit requirements. *Id.* FE 12 reported her concerns to her supervisors and other executives, including Mendoza, all of whom did nothing to address the issues and who allowed the conduct to continue. *Id.*

127. [redacted]

128. [redacted]

[redacted]

[redacted]

***The Company Failed to Integrate Its Acquisitions Throughout the Relevant Period***

129. As detailed herein, throughout the Relevant Period, the Individual Defendants repeatedly assured investors that the Company was successfully integrating its acquisitions, which was key to the Company's success.

130. However, in reality, the Company actually cut compliance efforts and policies, never implementing AdaptHealth's purported technological solutions and compliance systems meant to ensure that the acquired companies maintained proper billing procedures and that patients were receiving the equipment they ordered. Rather, when the Company made efforts to integrate the acquired companies months or years later, there were still improper billing practices, a lack of oversight, and a myriad of other issues.

***A. AdaptHealth Cut Compliance Systems At Its Acquired Companies***

131. Former employees of AdaptHealth stated that AdaptHealth cut compliance at the acquired companies and that, contrary to the Company's public statements, never implemented a Company-wide compliance system or corrected the illicit billing practices. For instance, according to FE 9, a former Senior Manager of Patient Acquisitions at Solara, and then AdaptHealth, from June 2019 until October 2022, alleged that when AdaptHealth took over it stripped the "checks and balances" at Solara by making all employees' compensation dependent on processing orders, rather than compliance. *Id.* ¶ 131.

132. Moreover, FE 12, a former Quality Assurance Manager at AdaptHealth from August 2018 until January 2022, stated that when AdaptHealth acquired Solara, Company management did not implement a system for employees to report improper billing practices and ignored repeated reports of billing problems. *Id.* ¶ 132. FE 12 confirmed that "there was no channel

to blow the whistle" and that the only method of reporting was to email supervisors, including Mendoza, who ignored her warnings. *Id.* FE 12 also confirmed that there was no automated system to check claims, there were no automated flags, and that AdaptHealth's compliance training was a "joke," with no specialized program in place. *Id.*

133. FE 14, a former Senior PAP specialist at AeroCare and then AdaptHealth, and FE 5, a former Inside Sales Specialist at Pinnacle and then AdaptHealth, confirmed that the Company failed to implement compliance systems at AeroCare and Pinnacle. *Id.* ¶¶ 133-34.

134. FE 5 alleged that she had never heard of the Company's "Audit Share" system, which AdaptHealth claimed to have implemented in 2016 as a Company-wide compliance tool for billing, despite FE 5 working in the billing department. Rather, FE 5 stated that AdaptHealth got rid of Pinnacle's compliance team that oversaw billing codes when the Company took over. *Id.* ¶ 134.

### *B. AdaptHealth Fails to Integrate Its Acquired Companies Onto Its Technology Systems*

135. In addition to cutting compliance programs at its acquired companies, AdaptHealth also failed to actually integrate its acquired companies into AdaptHealth, allowing the companies to operate independently rather than under one cohesive enterprise. This included failure of AdaptHealth to integrate its acquired companies onto its technology systems, including its revenue cycle management ("RCM") systems and patient management platforms, including Brightree.[11]

136. As detailed further herein, notwithstanding that many of the companies AdaptHealth acquired already used Brightree, including Solara and AeroCare, when AdaptHealth

[11] Brightree is a commonly used cloud-based platform designed to handle various workflows for GME companies, including interfacing with doctors (*i.e.*, referral sources), patients, manufacturers, distributors, and insurance companies (*i.e.*, payors).

acquired a company the acquired companies often maintained separate profiles rather than integrating onto one unified system through AdaptHealth. Moreover, for the acquired companies that did not use Brightree, like Pumps It, the integration of the information (including doctors, patients, manufacturers, distributors, and insurance companies) was even more complex.

137. [redacted]

138. [redacted]

139. Former employees asserted that the Company failed to integrate its acquired businesses, including the technology systems. For instance, FE 9, a former Senior Manager of

12 [redacted]

Patient Acquisitions at Solara and then AdaptHealth, recounted that AdaptHealth did not truly start to integrate Solara until 2021, despite the acquisition closing on July 2, 2020. AC ¶ 136. According to FE 9, AdaptHealth and Solara used Brightree as their main RCM and patient management platform but, instead of integrating Solara's system into AdaptHealth's, the Company kept Solara's separate Brightree system in place. *Id.* FE 9 stated that by the time they left the Company in October 2022, AdaptHealth never integrated Solara's system into AdaptHealth. *Id.*

140. [redacted]

141. Similar integration issues existed across the board at AdaptHealth's other acquired companies. For instance, according to FE 14, a Senior PAP Specialist at AeroCare and then AdaptHealth, stated that AdaptHealth similarly failed to integrate its Brightree system at AeroCare. AC ¶ 137. FE 14 recounted that AdaptHealth did not integrate AeroCare's legacy Brightree systems, which were already broken down into four different systems based on geographical regions, with AdaptHealth's own Brightree system. *Id.* FE 14 described how AdaptHealth attempted to integrate AeroCare's Brightree system for Colorado patients into

AdaptHealth's system, but the integration was painful and AdaptHealth stopped attempting integration. *Id.* Additionally, FE 14 recounted that the fractured systems created confusion among employees who did not know which policies to follow and that AdaptHealth failed to provide any guidance or training. *Id.*

142. Former employees at other of AdaptHealth's acquired companies, including Pinnacle and Diabetes Supply Company, also reported that the Company failed to integrate their billing systems with AdaptHealth's. *Id.* ¶¶ 138-139.

143. Despite these glaring issues, as detailed herein, the Company did not disclose these integration issues to investors, but rather, they touted the Company's integrations and technology systems.

***C. The Company's Delayed Integration Tactics Fail***

144. When the Company eventually tried to integrate its billing and patient tracking systems, albeit belatedly, there were major issues. Former employees from the acquired companies recounted that the Company's efforts to implement its software failed and that AdaptHealth's management were aware of the problems.

145. For instance, FE 9, a former Senior Manager of Patient Acquisitions at Solara and then AdaptHealth, recounted that when AdaptHealth tried to merge other diabetes supply acquisitions with Solara's billing system (rather than AdaptHealth's), that there were a myriad of errors, including widespread duplication of accounts in the system, and patients being billed multiple times, or never at all. AC ¶ 141. FE 9 stated that Mendoza was regularly informed of these issues, and that Mendoza worked closely with Vainio, with both executives reporting directly to Defendant Carson who was the COO and President of Diabetes. *Id.*

146. FE 5, a former employee of Pinnacle, recalled similar integration issues, stating that

AdaptHealth attempted to integrate Pinnacle into its billing and patient tracking systems in early 2022 (more than a year after the acquisition), and that the new system failed to properly keep track of prescriptions and other paperwork, causing management to direct employees to use Pinnacle's old system. *Id.* ¶ 143. As a result of these issues, there was widespread confusion because there were now two account numbers, which often led to the double billing of patients. *Id.*

147. FE 3 corroborated FE 5's recollections of integration at Pinnacle. FE 3 also stated that Vainio "ran the show" for the system issues at Pinnacle, and that his boss, Kevin Wood ("Wood"), then-Vice President of Operations at AdaptHealth, reported to Carson. *Id.* ¶ 144. FE 3 also stated that she suggested to Wood that they begin by integrating only a small set of patient information to the new system as a "test," but Wood insisted they convert all the data at once, which led to many of the problems. *Id.* FE 3 also recounted participating in meetings with Wood, Vainio, and her immediate supervisor (Senior Manager 1) in February 2022 around the same time the integration began. FE 3 stated that Senior Manager 1 expressed the issues with the system conversion and told the executives that she was very concerned. *Id.* However, the concerns were not heard. When FE 3 left in April 2023, the system still was not working properly. *Id.*

148. FE 11, a former CGM Sales Manager at Pumps It and then AdaptHealth, stated that the conversion from Pumps It's billing system (Total Information Management System) to AdaptHealth's Brightree system was riddled with problems. *Id.* ¶ 148. FE 11 recounted that integration did not start until early 2022 (more than six months after AdaptHealth acquired Pumps It), and that Brightree could not process Pumps It's orders correctly. *Id.* FE 11 stated that sometimes patients were double or triple billed because Brightree "flipped" already billed orders back to the beginning of the billing process, causing them to be billed again. *Id.* FE 11 stated that she complained to her supervisors about the issues, but she was told not to worry about it and that

it would eventually get better. *Id.* However, when FE 11 left in June 2022, the issues had not been resolved. *Id.* FE 13, who was FE 11's boss at Pumps It, explained the same issues as FE 11 and alleged that Defendant Carson was responsible for the integration. *Id.*

149. Additionally, FE 10, AdaptHealth's former Director of Training & Implementation, Operations, recounted similar issues as the former employees of the acquired companies, stating that AdaptHealth raced to acquire companies, but failed to properly integrate them. *Id.* ¶ 142.

150. Employees from the Company's acquired businesses frequently complained about the integration failures and lack of training on AdaptHealth's systems. FE 1, a former Human Resource Business Partner at Solara and then AdaptHealth, recounted that, starting in or around August 2020, employees began to complain because the acquired companies' billing and documentation systems, like Brightree, were not properly integrated into AdaptHealth's Brightree system. *Id.* ¶ 149.

151. Additionally, FE 1 stated that employees from acquired companies complained daily that they were not provided with adequate training on AdaptHealth's systems. *Id.* ¶ 150. FE 1 stated that when AdaptHealth tried to get everyone on the same platform, thousands of employees from acquired companies had never used Brightree before, but AdaptHealth did not provide adequate training, nor did the Company provide user or operating manuals or the tools to instruct employees on how to properly process claims. *Id.*

152. [redacted]

[redacted] However, former employees from Solara confirmed that the issues with the billing technology systems persisted when they departed in October 2022, and former employees from other acquired companies alleged that the issues persisted beyond 2022. *See* AC ¶¶ 136, 139, 145, 150.

***The SPO***

153. In the midst of the Company's illicit billing practices and flawed integration, and while the Company's financials were inflated as a result, on January 4, 2021, the Company issued a press release announcing a Secondary Public Offering ("SPO") of shares of its common stock.

154. On January 5, 2021, the Company issued a press release announcing the pricing of the SPO, and represented to investors that it would sell 7,250,000 shares of AdaptHealth class A common stock at $33.00 per share, and that a selling stockholder would sell an additional 750,000 shares of AdaptHealth common stock at a price of $33.00 per share. The Company also announced a 30-day option that the Company would grant for underwriters to purchase up to 1,200,000 additional shares of AdaptHealth common stock.

155. On or around January 5, 2021, the Company conducted the SPO. The SPO was conducted pursuant to a Form S-3 filed by the Company with the SEC on December 18, 2020 (the "SPO Registration Statement") and a Prospectus filed on a Form 424B5 with the SEC on January 4, 2021, and as amended on January 7, 2021, which incorporated and formed part of the SPO Registration Statement (the "SPO Prospectus," and together with the SPO Registration Statement, the "SPO Materials").

156. Pursuant to the SPO Materials, the Company sold 8,450,000 shares of AdaptHealth common stock, which included the full exercise of the underwriters' option to purchase the additional 1,200,000 shares, and a selling stockholder—Quadrant Management LLC, where

Defendant McGee was a principal and which Defendant Quasha controlled as CEO—sold an additional 750,000 shares of Company common stock.

157. As detailed herein, the SPO Materials incorporated revenue and earnings statements from the third and fourth quarter of fiscal year 2020 and included a series of materially false and misleading statements and/or omissions, including, *inter alia*, highlighting the strength of the Company's "revenue cycle management and billing processes," its "industry-leading technology platform[]," and its adoption of e-prescribing solutions" which purportedly "enhances transparency and reduces clinical errors and delays." Additionally, in reference to the AeroCare acquisition, the SPO Materials stated that AdaptHealth had plans to "reduce costs and improve operational efficiency in our current business and the businesses we acquire." Notably, the SPO Materials assured investors that AdaptHealth's "revenue cycle management and billing processes have both manual and computerized elements that are designed to maintain the integrity of revenue and accounts receivable."

***The Individual Defendants Were Aware of AdaptHealth's Wrongdoing***

158. As an initial matter, Company insiders, including Defendant McGee, were well aware of the risks associated with failure to comply with CMS regulations. Indeed, in January 2017, a former employee of QMES, LLC ("QMES")—AdaptHealth's predecessor company where Defendant McGee was CEO)—filed a *qui tam* complaint, alleging that QMES violated the False Claims Act by knowingly and willfully billing federal payors for products that patients were not prescribed.[13] Among other things, the complaint alleged that employees at QMES were directed by management, including Defendant McGee, to "upcode" medical equipment to obtain higher

[13] See *United States ex rel. Kelly v. QMES LLC, d/b/a Tricounty Medical Equipment and Supply, LLC,* Case No. 2:17-cv-00199-BMS (E.D. Pa.) (the "QMES Action").

reimbursement payments and to "not to notify the payors" of this fraudulent practice. QMES Action, ECF No. 1. This action was ultimately settled for $5.3 million and dismissed in 2023. *Id.*, ECF No. 39.

159. Moreover, the former employees' accounts detailed above show that AdaptHealth's integration failures and improper billing practices, and inadequate internal controls thereof, caused severe harm to the Company. Importantly, these accounts, [redacted] show that the issues were well known internally and that the Individual Defendants knew, or should have known, by virtue of their positions as directors and/or officers of AdaptHealth, of the issues.

160. Additionally, there were multiple consumer reports made throughout the Relevant Period regarding the Company's illicit billing practices and integration failures. Indeed, there have been multiple reports made to the Better Business Bureau by patients about AdaptHealth's improper billing and shipping practices.[14] There were also numerous negative Yelp reviews of AdaptHealth's acquired businesses regarding billing and shipping problems. AdaptHealth was purportedly aware of customer complaints on online forums, with Defendant McGee stating at a January 2021 conference that the Company "read the forums online" and was investing in addressing customers' complaints.

161. Moreover, multiple patient complaints about the Company's improper billing practices were escalated to two state's attorney generals' offices, with at least one office launching an investigation into the Company's billing practices.

162. For instance, according to complaints obtained by Capital Forum and shared with counsel in the Securities Class Action, a consumer submitted a complaint to the Michigan Attorney

---

[14] Better Business Bureau, *AdaptHealth*, https://www.bbb.org/us/pa/plymouth-meeting/profile/medical-equipment/adapthealth-0241-235992446/complaints (last visited Oct. 27, 2025).

General's Office regarding Healthy Living Medical Supply ("Healthy Living"), which was one of AdaptHealth's acquired companies, and stated that his personal portion of a bill for a Dexcom G6 CGM was $1,873.50. AC ¶ 164. The large amount of the bill meant that it was billed using an A-code, even though the Dexcom G6 is required to be billed using K-codes. *Id.* The consumer also complained that he discovered that his insurance had covered the full cost of the device, but he had given his credit card information to AdaptHealth, was double billed, and never contacted about the charge. *Id.*

163. [redacted]

164. Additionally, AdaptHealth's improper billing practices led the Louisiana Attorney General to open a criminal investigation into the Company. The Capitol Forum sought consumer complaints from the Louisiana Attorney General's Office regarding AdaptHealth and three of its diabetes medical supply division subsidiaries. In response to that record request, the Louisiana Attorney General's Office stated that such records exist, but they pertained to a "pending criminal litigation which can be reasonably anticipated," and the records could not be released until "such litigation has been finally adjudicated or otherwise settled." AC ¶ 165.

165. [redacted]

[redacted]

166. [redacted]

167. [redacted]

15 [redacted]

[redacted]

168. [redacted]

169. All of these served as red flags regarding the Company's billing practices and failed integration efforts. The Individual Defendants, by virtue of their positions as directors and/or officers of the Company, knew, or should have known, of the glaring issues with AdaptHealth's billing practices and its integration of its acquired companies. Nevertheless, the Individual Defendants failed to timely remediate the issues and repeatedly misled investors of AdaptHealth.

***Materially False and Misleading Statements***

170. On August 4, 2020, the Company issued a press release announcing its financial results for the second quarter of 2020 (the "2Q20 Earnings Release"). The 2Q20 Earnings Release discussed the Company's recent acquisition of Solara, stating that "[it] makes [the Company] a national leader in distribution of CGMs and other diabetes supplies[.]" Also in the 2Q20 Earnings Release, the Company reported net revenue of $232.1 million for the quarter, an increase of 87% from the same quarter in 2019, and adjusted EBITDA of $42.6 million for the quarter, an increase of 57% from the same quarter in 2019. Defendant McGee was quoted in the 2Q20 Earnings Release as attributing the positive financial results to the Company's "scalable growth model focused on organic sales[.]"

171. On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the second quarter of 2020 (the "2Q20 Earnings Call"), during

which Defendant McGee characterized the Company's acquisition of Solara as a "transformative transaction that will establish AdaptHealth as a leader in the fast-growing diabetes management business."

172. Also during the 2Q20 Earnings Call, Defendant Parnes stated that CGM was "largely a resupply business that generates recurring revenue and is very well suited to our core competencies in resupply, billing and referral relationships" that would "drive down healthcare costs associated with diabetes."

173. During the questions and answer portion of the 2Q20 Earnings Call, in response to a question regarding whether the Company was continuing to see strength in CGM resupply while the Company was experiencing slowdown in its other segments, Defendant McGee stated, in relevant part, that the "CGM business [] continues to have record-month-after-record-month," attributable to "a combination of us taking share, a combination of the Medicare relaxations opening up the number of eligible patients." Defendant McGee also stated that the recently acquired diabetes companies "combined with the existing CGM business . . . saw just an absolutely strong Q2."

174. On August 7, 2020, the Company filed its quarterly report for the period ended June 30, 2020, on a Form 10-Q with the SEC (the "2Q20 10-Q"). In addition to affirming the previously announced financial results, the 2Q20 10-Q posed risks to the Company related to its billing practices as merely hypothetical, despite having already materialized, stating, in relevant part:

> AdaptHealth could be adversely affected in some of the markets in which it operates if the auditing payor alleges substantial overpayments were made to AdaptHealth due to coding errors or lack of documentation to support medical necessity determinations. AdaptHealth cannot currently predict the adverse impact these measures might have on its financial condition and results of operations, but such impact could be material.

175. The 2Q20 10-Q was signed by Defendants McGee and Clemens. The 2Q20 10-Q

was also accompanied by certifications made by Defendants McGee and Clemens pursuant to Rules 13a-14(a) and 15(d)-14(a) of the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), wherein they attested to the accuracy of the 2Q20 10-Q.

176. On August 13, 2020, Defendant McGee attended the Canaccord Genuity Growth Conference on behalf of the Company. During his presentation at the conference, Defendant McGee touted the growth of the CGM market, stating that the "next-gen diabetes technology," including CGMs, were "in its infancy in terms of growth" and that "it's going to be a growth market for us." Defendant McGee also stated that the overall "CGM market is growing 20%-plus."

177. Defendant McGee also discussed the Solara acquisition during the conference, stating, in relevant part, that "if you look at Solara, which was the diabetes business that we acquired in July, if you looked at that plus the business that we . . . have owned since the beginning here on CGM, we're seeing just spectacular growth" and that "the Solara acquisition it sort of opened up a new frontier for us on the CGM side."

178. On November 4, 2020, the Company issued a press release announcing its financial results for the third quarter of 2020 (the "3Q20 Earnings Release"). In the 3Q20 Earnings Release, the Company reported net revenue of $284.4 million, which AdaptHealth attributed to "the tremendous efforts of our employees and their dedication to patients and healthcare partners." The 3Q20 Earnings Release also emphasized that the Company "remained opportunistic throughout the quarter, acquiring several diabetes managements and [HME] businesses in high-growth areas."

179. On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the third quarter of 2020 (the "3Q20 Earnings Call"). During the 3Q20 Earning Call, Defendant McGee stated that the "continued market growth in continuous glucose monitors and insulin pumps and believe adoption rates will accelerate."

180. On November 6, 2020, the Company filed its quarterly report for the period ended September 30, 2020, on a Form 10-Q with the SEC (the "3Q20 10-Q"). The 3Q20 10-Q again posed risks related to the Company surrounding its billing practices as hypothetical, stating, in relevant part:

> AdaptHealth could be adversely affected in some of the markets in which it operates if the auditing payor alleges substantial overpayments were made to AdaptHealth due to coding errors or lack of documentation to support medical necessity determinations. AdaptHealth cannot currently predict the adverse impact these measures might have on its financial condition and results of operations, but such impact could be material.

181. The 3Q20 10-Q was signed by Defendants McGee, Clemens, and Mullens. The 3Q20 10-Q was also accompanied by SOX Certifications made by Defendants McGee and Clemens, wherein they attested to the accuracy of the 3Q20 10-Q.

182. On December 18, 2020, January 4, 2021, and January 7, 2021, respectively, the Company filed the SPO Materials with the SEC. With respect to the Company's diabetes segment, the SPO Materials stated, in relevant part, that "[w]e believe that CGM and diabetes represent a $16 billion market segment. AdaptHealth believes that the CGM market could grow by 18% to $3.4 billion by 2022, and the insulin pump market could grow by 12% to $2.2 billion by 2022."

183. Under a section titled "Business Strategy," the SPO Materials stated, in relevant part, that "[w]e aim to grow our revenue while expanding margins through targeted strategies for organic growth as well as opportunistic acquisitions that take advantage of our scalable, integrated technology platform." The SPO Materials went on to state that "[w]e believe that our strong referral relationships and broad product portfolio will help drive market share growth" and represented that its organic growth was driven by "maintaining and broadening" the Company's "strong network of highly diversified referral relationships."

184. On January 14, 2021, Defendant McGee attended the JP Morgan Healthcare

Conference on behalf of the Company. During his presentation, Defendant McGee stated that "CGM [] and diabetes management products" were "a very, very stable and attractive growth business."

185. Then, on February 25, 2021, Defendants McGee and Griggs attended the SVB Leerink Global Healthcare Conference on behalf of the Company. During their presentation, Defendant McGee stated that the diabetes business "has been a huge growth engine" and that "to be honest the growth that we're seeing far transcends any headwinds."

186. On March 3, 2021, Defendants Parnes, Clemens, and Griggs attended the JP Morgan Global High Yield & Leveraged Finance Conference on behalf of the Company. During the conference, Defendant Parnes stated that "CGM in diabetes . . . is really growing very, very rapidly" and that "diabetes is growing at 70%" and emphasized that "the diabetes markets . . . have much faster organic growth as a market."

187. On March 4, 2021, the Company issued a press release announcing its financial and results for the fourth quarter and full year 2020 (the "4Q20 Earnings Release"). The 4Q20 Earnings Release reported that the Company had net revenue of $348.4 million for the fourth quarter. Defendant McGee was quote in the 4Q20 Earnings Release as stating, in relevant part, that "[i]n the fourth quarter, our diabetes business drove substantial growth as the result of high ordering patterns in December and our continued investment in accretive acquisitions" and that "[w]e are benefitting [] from the underlying growth in the diabetes business in general."

188. On the same day, the Company hosted an earnings conference call for investors and analysts to discuss its financial results for the fourth quarter and full year 2020 (the "4Q20 Earnings Call"). During the 4Q20 Earnings Call, in response to a question on "the dynamic between diabetes patient growth and unit growth versus [] pricing," Defendant McGee stated, in relevant part:

> Yeah. It's still so new in the grand scheme. Diabetes--advanced diabetes, primarily CGN, has really--was approved by Medicare, I believe in 2017, for reimbursement. And so, what you're seeing is there's been some shift to a pharmacy channel, which we acknowledge. And it hasn't at all slowed our top-line growth numbers. ***We've seen some payers switch to the Medicare payment methodology, not necessarily the rate but the K codes versus A codes.***
>
> And so, we continue to see this as we've been underwriting these acquisitions. We're underwriting kind of gross margins, settling in the low 30s range, which is, we think, completely appropriate for the category, and so nothing that we're concerned about whatsoever. I think we're just--we're really excited because we're still early in the compounding of the census, which is because a lot of people who are coming on CGM are still new to the therapy.
>
> We think that there's going to be a pretty long length of stay on this therapy, which means that not only are we seeing kind of growth in new starts, but we are seeing compounding in the census, which should persist for years***. I mean, we're really excited about the diabetes (SP).***[16]

189. On March 16, 2021, the Company filed its annual report for fiscal year 2020 on a Form 10-K with the SEC (the "2020 10-K"). The 2020 10-K represented that the risks to the Company related to its billing practices and coding errors were hypothetical, stating, in relevant part:

> AdaptHealth could be adversely affected in some of the markets in which it operates if the auditing payor alleges substantial overpayments were made to AdaptHealth due to coding errors or lack of documentation to support medical necessity determinations. AdaptHealth cannot currently predict the adverse impact these measures might have on its financial condition and results of operations, but such impact could be material.

190. The 2020 10-K was signed by Defendants McGee, Griggs, Clemens, Mullen, Barasch, Parnes, Quasha, Connors, Weaver, Wolf, Coppens, Williams, and Lundberg. The 2020 10-K was also accompanied by SOX Certifications made by Defendants McGee, Griggs, and Clemens, wherein they attested to the accuracy of the 2020 10-K.

191. On May 6, 2021, the Company issued a press release announcing its financial

---

[16] Emphasis is added unless otherwise noted.

results for the first quarter of 2021 (the "1Q21 Earnings Release"). 1Q21 Earnings Release reported net revenue of $482.1 million for the quarter, which the Company attributed to its "growing diabetes product line" and its "strong organic growth for the quarter and the continued strength of [its] M&A pipeline."

192. On that same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the first quarter of 2021 ("1Q21 Earnings Call"). During the 1Q21 Earnings Call, Defendant Clemens stated that the Company's organic growth was up significantly, which he claimed was "led by new starts in our diabetes product lines."

193. Also during the 1Q21 Earnings Call, Defendant Griggs stated that with the "***current organic growth in diabetes and resupply***, we feel confident that the balances of 2021 will meet our organic growth expectations."

194. On May 10, 2021, the Company filed its quarterly report for the period ended March 31, 2021, on a Form 10-Q with the SEC (the "1Q21 10-Q"). The 1Q21 10-Q contained the same hypothetical risk statement regarding the Company's billing practices:

> AdaptHealth could be adversely affected in some of the markets in which it operates if the auditing payor alleges substantial overpayments were made to AdaptHealth due to coding errors or lack of documentation to support medical necessity determinations. AdaptHealth cannot currently predict the adverse impact these measures might have on its financial condition and results of operations, but such impact could be material.

195. The 1Q21 10-Q was signed by Defendants Griggs, Clemens, and Mullen. The 1Q21 10-Q was also accompanied by SOX Certifications made by Defendants Griggs and Clemens, wherein they attested to the accuracy of the 1Q21 10-Q.

196. On June 2, 2021, Defendants Griggs, Parnes, and Clemens attended the Jefferies Healthcare Conference on behalf of the Company. During the conference, Defendant Clemens represented that diabetes was "beating our internal expectations for that business line."

Additionally, Defendant Parnes touted that "our diabetes business today is growing extremely quickly."

197. On July 6, 2021, the Company field a proxy statement on a Schedule 14A with the SEC (the "2021 Proxy"). The 2021 Proxy assured investors that the Board was overseeing risks to the Company, stating:

> Richard Barasch serves as the Chairman of our board of directors, Stephen Griggs serves as our Chief Executive Officer and Joshua Parnes serves as our President. We believe that the most effective leadership structure at the present time is to have separate Chairman, Chief Executive Officer and President positions because this allows the board of directors to benefit from having multiple strong voices bringing separate views and perspectives to meetings. Our board of directors has established an Executive Committee, consisting of Richard Barasch, Stephen Griggs, Ted Lundberg, Joshua Parnes, Bradley Coppens and Alan Quasha, to which the board has delegated certain decision-making power, including the ability to approve (i) any merger or acquisition transaction or capital expenditure transaction involving an aggregate cash investment or purchase price between $15 million and $40 million and (ii) any merger or acquisition transaction with an equity consideration component up to an aggregate purchase price of $40 million.
>
> ***Our board of directors is responsible for overseeing the overall risk management process at the Company***. Risk management is considered a strategic activity within the Company and, responsibility for managing risk currently rests with executive management while the board participates in the oversight of the process. The oversight responsibility of our board is enabled by management reporting processes designed to provide visibility to the board about the identification, assessment, and management of critical risks. Those areas of focus include strategic, operational, financial and reporting, compliance and other risks. ***Our audit committee enhances the board's oversight of risk management and discusses with management, the independent auditor and the internal auditor policies with respect to risk assessment and risk management, including significant operating and financial risk exposures and the steps management has taken to monitor, control and report such exposures.*** Further, our compensation committee enhances the board's oversight of risk management by considering the impact of the Company's compensation policies and plans, and the incentives created by the Company's compensation policies and plans, on the Company's risk profile.

198. The 2021 Proxy was solicited by Defendants Barasch, Connors, Coppens, Griggs, Lundberg, Parnes, Quasha, Weaver, Williams, and Wolf.

199. On August 5, 2021, the Company issued a press release announcing its financial

results for the second quarter of 2021 (the "2Q21 Earnings Release"). The 2Q21 Earnings Release reported net revenue of $617 million for the quarter. Defendant Griggs was quoted in the 2Q21 Earnings Release as stating, in relevant part:

> We are very pleased with our financial results this quarter which were driven by the outstanding efforts of our combined team. Our results were largely driven by a full quarter of AeroCare and realization of integration synergies. Our business continues to grow organically as well as through strategic acquisitions in key markets which complement our national platform. . . . It has been six months since the acquisition of AeroCare, and we have already achieved many of the ambitious goals we set out to accomplish including improving patient access, patient experience, and clinical outcomes. With these goals in mind, we continue to execute on our strategy of organic growth, improving operations, and closing accretive acquisitions.

200. On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the second quarter of 2021 (the "2Q21 Earnings Call"). During the 2Q21 Earnings Call, Defendant Parnes touted the Company's diabetes products as AdaptHealth's fastest growing product category, stating, in relevant part, that "we are accelerating growth in all of our product categories, most dramatically in diabetes, our fastest growing product category."

201. On August 6, 2021, the Company filed a quarterly report for the period ended June 30, 2021, on a Form 10-Q with the SEC (the "2Q21 10-Q").

202. The 2Q21 10-Q again represented that the risks to the Company related to its billing practices and coding errors were merely hypothetical, despite already having materialized, stating:

> AdaptHealth could be adversely affected in some of the markets in which it operates if the auditing payor alleges substantial overpayments were made to AdaptHealth due to coding errors or lack of documentation to support medical necessity determinations. AdaptHealth cannot currently predict the adverse impact these measures might have on its financial condition and results of operations, but such impact could be material.

203. The 2Q21 10-Q was signed by Defendants Griggs, Clemens, and Mullen. The 2Q21

10-Q was also accompanied by SOX Certifications made by Defendants Griggs and Clemens, wherein they attested to the accuracy of the 2Q21 10-Q.

204. On August 11, 2021, Defendants Clemens, Griggs, and Parnes attended the Canaccord Genuity Growth Conference on behalf of the Company. At the conference, Defendant Clemens stated, in relevant part, that "the terrific growth we're seeing in the diabetes product line, frankly, beating our own view of kind of end market growth. And we're just very, very pleased with the business. So, overall we did raise guidance."

205. On November 4, 2021, the Company issued a press release announcing its financial results for the third quarter of 2021 (the "3Q21 Earnings Release"). The 3Q21 Earnings Release reported net revenue of $653.3 million for the quarter and also increased the financial guidance for fiscal year 2021, stating, in relevant part:

> **<u>Guidance Increased for 2021</u>**
>
> Based on current business, market trends, and acquisitions completed to date, the Company is increasing its previously issued financial guidance for fiscal year 2021 as follows:
>
> - Net revenue of $2.41 billion to $2.46 billion, up from prior guidance of $2.38 billion to $2.48 billion;
> - Adjusted EBITDA of $570 million to $580 million, up from prior guidance of $555 million to $580 million; and
> - Adjusted EBITDA less Patient Equipment Capex of $365 million to $375 million, up from prior guidance of $360 million to $375 million.

206. Defendant Griggs was also quoted in the 3Q21 Earnings Release as stating, in relevant part:

> We are very pleased with our operating and financial performance for the quarter, which reflected the outstanding efforts of our team members. We continue to drive organic growth in the face of challenging external circumstances (including the ongoing impact of the Philips recall), as well as further expanding our presence through strategic acquisitions in key markets.

207. On the same day, the Company hosted an earnings call for investors and analysts

to discuss its financial results for the third quarter of 2021 (the "3Q21 Earnings Call"), during which Defendant Griggs stated, in relevant part, "[m]ore than a year ago, we entered the diabetes business with the acquisition of Solara, and we remain very pleased with its performance, which continues to exceed our expectations for 2021. We continue to grow this business with strategic acquisitions."

208. Also during the 3Q21 Earnings Call, Defendant Clemens touted the Company's growth, stating, in response to a question about the comparison between the growth of diabetes pre and post pandemic, that:

> I think that over the last several years, you know, the end market just continues to grow, you know, very rapidly, you now, we think we're right in line with end market growth and diabetes and 2022, frankly, we think we're capturing a couple of points of shares as well.

209. On November 9, 2021, the Company filed a quarterly report for the period ended September 20, 2021, on a Form 10-Q with the SEC (the "3Q21 10-Q"). The 3Q21 10-Q again represented that the risks to the Company related to its billing practices and coding errors were merely hypothetical, despite already having materialized, stating:

> AdaptHealth could be adversely affected in some of the markets in which it operates if the auditing payor alleges substantial overpayments were made to AdaptHealth due to coding errors or lack of documentation to support medical necessity determinations. AdaptHealth cannot currently predict the adverse impact these measures might have on its financial condition and results of operations, but such impact could be material.

210. The 3Q21 10-Q was signed by Defendants Griggs, Clemens, and Mullens. The 3Q21 10-Q was also accompanied by SOX Certifications made by Defendants Griggs and Clemens, wherein they attested to the accuracy of the 3Q21 10-Q.

211. On February 18, 2022, Defendants Griggs, Clemens, and Parnes attended the SVB Leerink Global Healthcare Conference on behalf of the Company. During the conference,

Defendant Parnes stated, in relevant part, that "we're seeing steady growth that I was actually surprised that wasn't as impacted by COVID is the diabetes division, just really strong organic growth over the last year in general, and that market obviously is continuing to grow for us."

212. The statements identified in ¶¶ 170 to 211 were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose, *inter alia*, that: (i) the Company had misstated its ability to generate and sustain organic growth in its diabetes segment; (ii) the Company had engaged in illicit billing practices in seeking reimbursement from insurance companies; (iii) the risks to the Company related to engaging in overbilling as a result of "coding errors" were not merely hypothetical and had already materialized; (v) the Company failed to maintain proper internal controls over its operations and financial reporting; and (vi) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

213. The truth began to emerge on March 1, 2022, when the Company filed the 2021 10-K with the SEC. In the 2021 10-K, AdaptHealth admitted that the Company suffered from materially ineffective "process level controls" in "***substantially all processes*** that support our financial statements and reporting," which would include included the auditing and billing processes that the Company had touted as a strength.

214. On this news, the Company's stock price fell $2.15 per share, or approximately 12.3%, to close at $15.28 per share on March 2, 2022.

215. However, thereafter, the Individual Defendants continued to mislead investors and the public by assuring them that these weaknesses were limited, announcing that the Company had significant new technological developments that would purportedly remediate these weaknesses,

and issuing numerous materially false and misleading statements regarding the Company's financials, billing practices, and acquisitions.

216. For instance, also in the 2021 10-K, under the "Risks Factors" section, the Company represented that the risks to AdaptHealth related to its billing practices and coding errors were merely hypothetical, despite already having materialized, stating:

> AdaptHealth could be adversely affected in some of the markets in which it operates if the auditing payor alleges substantial overpayments were made to AdaptHealth due to coding errors or lack of documentation to support medical necessity determinations. AdaptHealth cannot currently predict the adverse impact these measures might have on its financial condition and results of operations, but such impact could be material.

217. The 2021 10-K was signed by Defendants Griggs, Clemens, Mullen, Barasch, Parnes, Connors, Weaver, Wolf, Coppens, Williams, Lundberg, and Belinfanti. The 2021 10-K was also accompanied by SOX Certifications made by Defendants Griggs and Clemens, wherein they attested to the accuracy of the 2021 10-K.

218. On May 2, 2022, the Company filed a proxy statement on a Schedule 14A with the SEC (the "2022 Proxy"). The 2022 Proxy assured investors that the Board was overseeing risks to the Company, stating, in relevant part:

> Richard Barasch serves as the Chairman of our board of directors, Stephen Griggs serves as our Chief Executive Officer and Joshua Parnes serves as our President. We believe that the most effective leadership structure at the present time is to have separate Chairman, Chief Executive Officer and President positions because this allows the board of directors to benefit from having multiple strong voices bringing separate views and perspectives to meetings. Our board of directors has established an Executive Committee, consisting of Richard Barasch, Stephen Griggs, Ted Lundberg, Joshua Parnes and Gregory Belinfanti, to which the board has delegated certain decision-making power, including the ability to approve (i) any merger or acquisition transaction or capital expenditure transaction involving an aggregate cash investment or purchase price between $15 million and $40 million and (ii) any merger or acquisition transaction with an equity consideration component up to an aggregate purchase price of $40 million.

Our board of directors is responsible for overseeing the overall risk management process at the Company. Risk management is considered a strategic activity within the Company and, responsibility for managing risk currently rests with executive management while the board participates in the oversight of the process. The oversight responsibility of our board is enabled by management reporting processes designed to provide visibility to the board about the identification, assessment, and management of critical risks. Those areas of focus include strategic, operational, financial and reporting, compliance and other risks. Our audit committee enhances the board's oversight of risk management and discusses with management, the independent auditor and the internal auditor policies with respect to risk assessment and risk management, including significant operating and financial risk exposures and the steps management has taken to monitor, control and report such exposures. Further, our compensation committee enhances the board's oversight of risk management by considering the impact of the Company's compensation policies and plans, and the incentives created by the Company's compensation policies and plans, on the Company's risk profile.

219. The 2022 Proxy was solicited by Defendants Barasch, Belinfanti, Connors, Coppens, Griggs, Lundberg, Parnes, Weaver, Williams, and Wolf.

220. On May 10, 2022, the Company issued a press release announcing its financial results for the first quarter of 2022 (the "1Q22 Earnings Release). The 1Q22 Earnings Release reported net revenue of $706.2 million for the first quarter of 2022. Defendant Griggs was quoted in the 1Q22 Earnings Release as stating, in relevant part:

We are very pleased with our strong start to the year. During the quarter we have seen continued strength in our diabetes product line, consistent with our expectations, and our HME product line continues to be resilient as CPAP patient set ups in March and April were at or near 2021 levels.

221. On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the first quarter of 2022 (the "1Q22 Earnings Call"), during which Defendant Parnes stated that the Company was seeking additional acquisitions, stating that "we are constantly assessing strategic opportunities to . . . increase our revenue." Also during the 1Q22 Earnings Call, Defendant Parnes stated, in relevant part, that:

[W]e executed on a plan to aggressively move into the diabetes market with the acquisition of Solara in July 2020, followed by six additional acquisitions in

> diabetes space over the next 18 months. ***As we have integrated Solara and our other diabetes supply acquisitions, we have successfully implemented many of the technologies used in our HME resupply business to increase revenue and improve operational efficiencies***.

222. Also on May 10, 2022, the Company filed a quarterly report for the period ended March 31, 2022, on a Form 10-Q with the SEC (the "1Q22 10-Q"). The 1Q22 10-Q incorporated the "Risk Factors" section from the 2021 10-K, including the risks related to the Company's billing practices detailed in ¶ 216, *supra*.

223. The 1Q22 10-Q was signed by Defendants Griggs, Clemens, and Mullen. The 1Q22 10-Q was also accompanied by SOX Certifications made by Defendants Griggs and Clemens, wherein they attested to the accuracy of the 1Q22 10-Q.

224. On May 11, 2022, Defendants Griggs and Clemens attended the Bank of America Healthcare Conference on behalf of the Company. During the conference, in response to a question regarding what was driving the Company's growth, Defendant Griggs stated, in relevant part, that "growth rates are going to be pretty strong for certainly the foreseeable future" and that "we're very, very comfortable with that high teens growth rate right now."

225. On June 8, 2022, Defendant Parnes attended the Jeffries Healthcare Conference on behalf of AdaptHealth. At the conference, Defendant Parnes stated, "we feel very comfortable with that as we stand here today . . . when we think about the product lines, first is diabetes. I mean, very high growth." Also during the conference, Defendant Parnes stated, in response to an analyst's question about the sustainability of the Company's growth, that "one of the interesting things we thought about strategically that would be a good fit for us was the resupply component of a CGM . . . that played itself out where we've done a very, very nice job . . . where we've been able to grow their resupply footprint consistently, steadily."

226. On August 9, 2022, the Company issued a press release announcing its financial

results for the second quarter of 2022 (the "2Q22 Earnings Release"). The 2Q22 Earnings Release reported that the Company had net revenue of $727.6 million for the quarter. Additionally, Defendant Griggs was quoted in the 2Q22 Earnings Release as stating, in relevant part, "[w]e are very pleased with our performance through the first half of the year" and that "our diabetes product line continues to post double-digit growth." Defendant Griggs also touted the Company's investment in technology, stating, "AdaptHealth continues to make important investments in technology throughout the organization that will drive improved operating performance, lower cost of care, and better outcomes for patients."

227. On the same day, the Company filed a quarterly report for the period ended June 30, 2022, on a Form 10-Q with the SEC (the "2Q22 10-Q"). The 2Q22 10-Q incorporated the "Risk Factors" section from the 2021 10-K, including the risks related to the Company's billing practices detailed in ¶ 216, *supra*.

228. The 2Q22 10-Q was signed by Defendants Griggs and Clemens. The 2Q22 10-Q was also accompanied by SOX Certifications made by Defendants Griggs and Clemens, wherein they attested to the accuracy of the 2Q22 10-Q.

229. On November 8, 2022, the Company issued a press release announcing its financial results for the third quarter of 2022 (the "3Q22 Earnings Release"). The 3Q22 Earnings Release reported that the Company had "record" net revenue of $765.5 million for the quarter. Defendant Griggs was quoted in the 3Q22 Earnings Release as stating, in relevant part, that "[w]e delivered another solid quarter as we continued to capitalize on strong demand in our HME and Sleep product lines with CPAP patient set-ups at or near record levels each month of the quarter, and our diabetes product line once again posting double-digit growth." Defendant Griggs was also quoted as touting the Company's "operational excellence initiatives" and the "resilience of [its] business."

230. Additionally, Defendant Parnes was quoted in the 3Q22 Earnings Release as stating, in relevant part, that "[t]he healthcare marketplace continues to move aggressively to the home environment, and we are positioning AdaptHealth to lead this shift with our technology-enabled, patient-first integrated care model."

231. On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the third quarter of 2022 (the "3Q22 Earnings Call"), during which Defendant Griggs stated, "[w]e continue to be confident in the sustained growth potential in diabetes, given the expanding acceptance of CGM as a critical component in managing diabetes and related comorbidities."

232. Later during the 3Q22 Earnings Call, Defendant Griggs assured investors of the Company's future growth prospects, stating, in relevant part, "everybody believes that the growth rates that we've seen in the past two or three years on the CGMs will, maybe not quite as high, but they'll still continue throughout the next two or three years."

233. Also on November 8, 2022, the Company filed a quarterly report for the period ended September 30, 2022, on a Form 10-Q with the SEC (the "3Q22 10-Q"). The 3Q22 10-Q incorporated the "Risk Factors" section from the 2021 10-K, including the risks related to the Company's billing practices detailed in ¶ 216, *supra*.

234. The 3Q22 10-Q was signed by Defendants Griggs and Clemens. The 3Q22 10-Q was also accompanied by SOX Certifications made by Defendants Griggs and Clemens, wherein they attested to the accuracy of the 3Q22 10-Q.

235. The statements identified in ¶¶ 216-233 were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose, *inter alia*, that: (i) the Company had misstated its ability to generate and

sustain organic growth in its diabetes segment; (ii) the Company had engaged in illicit billing practices in seeking reimbursement from insurance companies; (iii) the risks to the Company related to engaging in overbilling as a result of "coding errors" were not merely hypothetical and had already materialized; (v) the Company failed to maintain proper internal controls over its operations and financial reporting; and (vi) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Truth is Revealed***

236. The truth further emerged on February 27, 2023, when the Company issued the 4Q22 Earnings Release and revealed that the Company had experienced a loss of $0.02 per share for the fourth quarter of 2022. Additionally, in the 4Q22 Earnings Release, AdaptHealth reported 2022 adjusted EBITDA of $40 million below guidance, and total 2022 net revenue of $50 million below guidance, with almost all of the revenue growth from 2021 coming from acquisitions and only 3.5% from "non-acquired growth." Defendant Griggs revealed in the 4Q22 Earnings Release that "[a]djusted EBITDA fell short of our full year guidance due primarily to larger impacts from revenue mix and cost pressures than we previously expected." The Company also lowered its 2023 revenue guidance by more than 1.5 percent and its 2023 adjusted EBITDA by over 5.3 percent.

237. On this news, the price of AdaptHealth stock declined by $5.99 per share, or roughly 27%, to close at $15.99 per share on February 28, 2023.

238. On May 9, 2023, the truth continued to emerge when the Company issued the 1Q23 Earnings Release. In the 1Q23 Earnings Release, the Company reported net revenue of $744.6 million, which was only an increase of 5.4 percent, as well as "non-acquired" growth of only 4.7 percent. AdaptHealth further disclosed adjusted EBITDA of $134 million, which was 2.7 percent

lower than the first quarter of 2022. Defendant Griggs was quoted in the 1Q23 Earnings Release as stating that "a decline in our Diabetes business, largely driven by the pump and supplies categories," hurt growth. AdaptHealth further announced that Griggs would be stepping down as CEO of the Company.

239. On this news, the Company's stock price fell $0.77 per share, or approximately 6.4%, to close at $11.30 per share on May 9, 2023.

240. Then, on November 7, 2023, the full truth finally emerged when the Company issued the 4Q23 Earnings Release and revealed that AdaptHealth had a net loss of $454.1 million, which "largely result[ed] from a $511.9 million pre-tax write down of goodwill."

241. On the same day, the Company filed the 4Q23 10-Q, which revealed that the impairment was triggered by the Company's declining stock price and also listed factors considered in the assessment, which were impacted by AdaptHealth's lack of ability to execute on the integration of its acquisitions. As AdaptHealth stated, the value of goodwill on the Company's balance sheet was the direct result of the "business acquisitions the Company has made." Therefore, the value of the Company's goodwill was significantly dependent upon its ability to successfully integrate the acquired companies into the Company's operations.

242. On this news, the Company's stock price fell $1.35 per share, or approximately 16%, to close at $7.69 per share on November 7, 2023. The Company's stock price continued to decline the following day, closing at $6.50 per share on November 8, 2023.

***Stock Repurchases***

243. According, to the Company's public filings, while the price of Company stock was artificially inflated due to the false and misleading statements detailed above, the Individual Defendants caused the Company to repurchase approximately 2.9 million shares of its own stock,

for a total of over $31.6 million during the Relevant Period.

244. According to the Company's quarterly and annual reports filed on Forms 10-Q and 10-K with the SEC, AdaptHealth made the following repurchases of its own stock during the Relevant Period:

| Dates of Stock Repurchase | Number of Shares Repurchased | Average Price Per Share on Date of Repurchase | Total Cost of Repurchase |
|---|---|---|---|
| June 1, 2022 to June 30, 2022 | 199,418 | $16.95 | $3,380,135.10 |
| August 1, 2022 to August 31, 2022 | 436,914 | $19.63 | $8,576,621.82 |
| September 1, 2022 to September 30, 2022 | 114,503 | $18.90 | $2,164,106.70 |
| October 1, 2023 to October 31, 2023 | 2,227,312 | $7.88 | $17,551,218.60 |

245. Given that the price of AdaptHealth stock was $6.50 per share on November 8, 2023, after the corrective disclosures, the true value of the 2,978,147 repurchased shares was roughly $19.4 million. Accordingly, the Individual Defendants caused the Company to overpay by approximately *$12.3 million* to repurchase these shares during the Relevant Period.

***The Securities Class Action***

246. On October 24, 2023, the Securities Class Action was filed against the Company and Defendants McGee, Parnes, Griggs, Clemens, Mullen, Barasch, Quasha, Connors, Weaver, Wolf, Coppens, and Williams, among others, alleging violations of Sections 10(b) and 20(a) of the Exchange Act and Sections 11, 12(a)(2), and 15 of the Securities Act of 1933. On May 14, 2024, the plaintiffs in the Securities Class Action filed the Amended Complaint. Securities Class Action, ECF No. 59.

247. On July 23, 2024, the defendants in the Securities Class Action filed a Motion to Dismiss the Amended Complaint (the "Motion to Dismiss"). *Id.*, ECF No. 65.

248. On June 24, 2025, at the request of the parties in the Securities Class Action, this Court entered an order holding the Motion to Dismiss in abeyance pending mediation proceedings in the Securities Class Action. *Id.*, ECF No. 89.

249. On October 24, 2025, the parties in the Securities Class Action filed a letter with the Court announcing that they agreed in principle to settle the Securities Class Action, and requesting thirty days to "negotiate the formal settlement agreement and related papers, and for Lead Plaintiffs to file their motion for preliminary approval of the settlement." *Id.*, ECF No. 89. On November 11, 2021, lead plaintiffs in the Securities Class Action filed an additional letter with the Court seeking an extension until December 19, 2025, to file a Motion for Preliminary Approval of Settlement. *Id.*, ECF No. 91.

***Harm to the Company***

250. As a direct and proximate result of the Individual Defendants' misconduct, AdaptHealth has lost and expended, and will continue to lose and expend, millions of dollars.

251. Such expenditures include, but are not limited to: (i) the legal fees associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection therewith; (ii) the amount paid to settle the Securities Class Action; (iii) the significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company; and (iv) costs of remediating deficiencies in the Company's internal controls.

252. Additionally, during the Relevant Period, the Individual Defendants caused the Company to initiate the repurchase of its common stock that substantially damaged the Company.

253. Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

254. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

255. AdaptHealth is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

256. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

257. Plaintiff is a current shareholder of AdaptHealth stock and has been a continuous shareholder of the Company throughout the period of the Individual Defendants' wrongdoing alleged herein.

258. A pre-suit demand on the Board of AdaptHealth is futile and, therefore, excused. At the time this action was commenced, the nine-member Board was comprised of Defendants Wolf, Belinfanti, Connors, Coppens, Lundberg, Weaver, and Williams (the "Director Defendants"), and non-parties Suzanne Foster ("Foster") and Diana Nole ("Nole," and together with Foster and the Director Defendants, the "Directors"). Accordingly, Plaintiff is only required to show that five Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because the Director Defendants face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

259. The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized, and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

260. The Director Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Director Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

261. As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of AdaptHealth, the Director Defendants knew, or should have known, the material facts surrounding AdaptHealth's financial condition and internal control mechanisms.

262. Director Foster is not disinterested or independent and is therefore incapable of considering a demand. Foster has served as the Company's CEO since May 2024. Thus, the Company admits that Foster is a non-independent director pursuant to the requirements set forth by the Nasdaq.

263. Furthermore, Director Defendants Wolf, Connors, Coppens, Weaver, and Williams are not disinterested or independent because they are named as a defendants, and face significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing false and misleading statements during the Relevant Period.

264. Moreover, Director Defendants Connors, Weaver, Wolf, Coppens, Williams, Lundberg, and Belinfanti each signed the 2021 10-K.

265. Director Defendants Connors, Coppens, Lundberg, Weaver, Williams, and Wolf each solicited the 2021 Proxy, which led to the reelection of Defendants Coppens, Weaver, and Wolf to the Board, allowing them to continue breaching their fiduciary duties to the Company.

266. Director Defendants Belinfanti, Connors, Coppens, Griggs, Lundberg, Parnes, Weaver, Williams, and Wolf each solicited the 2022 Proxy, which led to the reelection of Defendants Barasch and Belinfanti to the Board, allowing them to continue breaching their fiduciary duties to the Company.

267. Accordingly, by signing and/or soliciting the 2021 10-K, 2021 Proxy, and 2022 Proxy, all of which contained materially false and misleading statements, each of the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus, demand upon them is futile, and therefore excused.

268. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Director Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Director Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of AdaptHealth stock and stock options they held.

269. Moreover, the Directors have taken no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

270. Director Defendants Coppens, Lundberg, and Wolf (the "Audit Defendants") serve as members of the Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to, *inter alia*, internal controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding material deficiencies in the Company's accounting practices and the adequacy of the Company's internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

271. The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to AdaptHealth's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

272. The Director Defendants are not independent or disinterested in light of their longstanding business and personal relationships with each other and with the Company. For

instance, between 2002 and 2015, Director Defendant Connors served as Professional Practice Partner, SEC Reviewing Partner, and as a member of the board of directors at KPMG LLP, which has served as the independent registered public accounting firm for the Company since at least fiscal year 2020. Moreover, Director Defendants Coppens and Belinfanti both held positions at One Equity Partners ("OEP"), with Coppens previously serving as a Senior Managing Director at OEP and Belinfanti currently serving as a Senior Managing Director and as a member of the Investment Committee at OEP.

273. Additionally, each of the Directors derive substantial revenue from the Company, control the company, and are indebted to each other. These conflicts of interest have precluded the current directors from adequately monitoring the Company's operations and internal controls and call into question the other Director Defendants' conduct. Significantly, none of the Board's current members have taken remedial action to redress the conduct alleged herein.

274. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

275. The acts complained of herein constitute violations of fiduciary duties owed by AdaptHealth's officers and directors, and these acts are incapable of ratification.

276. Accordingly, for all of the reasons set forth above, Directors cannot consider a

demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## COUNT I
### Against the Individual Defendants for Violations of § 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R.§240.14a-9)

277. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

278. The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

279. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that:

> It shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 781].

280. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

281. The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2021 Proxy and 2022 Proxy (collectively, the "Proxy Statements"), which were each filed with the SEC. As alleged above, the Proxy Statements were materially false and misleading because they failed to disclose, *inter alia*, that, the Board and Company management were not effectively overseeing risks to the

Company, including risks associated with the Company's billing practices, integration of its acquired companies, and the Company's financial and public reporting.

282. The misrepresentations and omissions in the Proxy Statements were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for determination in the Proxy Statements, including, but not limited to, the reelection of certain Individual Defendants.

283. Indeed, the materially false and misleading statements contained in the 2021 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Coppens, Weaver, and Wolf to the Board, thereby allowing them to continue breaching their fiduciary duties to AdaptHealth.

284. Additionally, the materially false and misleading statements contained in the 2022 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Barasch and Belinfanti to the Board, thereby allowing them to continue breaching their fiduciary duties to AdaptHealth

285. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

286. Plaintiff, on behalf of AdaptHealth, has no adequate remedy at law.

## COUNT II
**Against the Individual Defendants for Violations of § 10(b) of the Exchange Act (15 U.S.C. § 78(j)) and Rule 10b-5 (17 C.F.R. § 240.10b-5)**

287. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

288. The Individual Defendants participated in a scheme with the purpose and effect of defrauding AdaptHealth. Not only is AdaptHealth now defending claims that it violated Section

10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon AdaptHealth by the Individual Defendants.

289. During the Relevant Period, while the price of the Company's stock was artificially inflated, as a result of the false and misleading statements issued, the Individual Defendants caused the Company to overpay by approximately $12.3 million to repurchase over 2.9 million shares of AdaptHealth common stock.

290. The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

291. The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about AdaptHealth not misleading.

292. The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by AdaptHealth.

293. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of

material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them as members of the Board, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

294. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, and Rule 10b-5, caused the Company to expend approximately $31.6 million in the repurchase of AdaptHealth stock at artificially inflated prices and, thus, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

295. By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

296. Plaintiff, on behalf of AdaptHealth, has no adequate remedy at law.

**COUNT III**
**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a))**

297. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

298. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions of control within the Company, the Individual Defendants had the authority to cause the Company to issue materially false and misleading statements, and to repurchase AdaptHealth stock at prices artificially inflated by those materially false and misleading statements.

299. Plaintiff, on behalf of AdaptHealth, has no adequate remedy at law.

## COUNT IV
**Against the Individual Defendants for Breach of Fiduciary Duties**

300. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

301. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

302. Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

303. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

304. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) the Company had misstated its ability to generate and sustain organic growth in its diabetes segment; (ii) the Company had engaged in illicit billing practices; (iii) the risks to the Company related to engaging in overbilling as a result of "coding errors" were not

merely hypothetical and had already materialized; (iv) the Company was not effectively or timely integrating its acquired companies; (v) the Company failed to maintain proper internal controls over its operations and financial and public reporting; and (vi) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

305. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

306. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

307. Moreover, further breach of their fiduciary duties during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase nearly three million shares of its own stock at artificially inflated prices before the fraud was exposed.

308. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

309. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself

in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

310. Plaintiff, on behalf of AdaptHealth, has no adequate remedy at law.

**COUNT V**
**Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty**

311. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

312. By encouraging and accomplishing the illegal and improper actions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

313. Plaintiff, on behalf of AdaptHealth, has no adequate remedy at law.

**COUNT VI**
**Against the Individual Defendants for Unjust Enrichment**

314. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

315. By their wrongful acts and omissions, violations of law, and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of and to the detriment of AdaptHealth.

316. The Individual Defendants either benefitted financially from the improper conduct,

or received bonuses, stock options, or similar compensation from AdaptHealth that was tied to the performance or artificially inflated valuation of AdaptHealth, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

317. Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

318. As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

319. Plaintiff, on behalf of AdaptHealth, has no adequate remedy at law.

**COUNT VII**
**Against the Individual Defendants**
**for Waste of Corporate Assets**

320. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

321. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

322. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; (ii) causing the Company to repurchase approximately 2,978,147 shares of its own common stock at artificially inflated prices; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

323. As a result of the waste of corporate assets, the Individual Defendants are liable to

the Company.

324. Plaintiff, on behalf AdaptHealth, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Directing AdaptHealth to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect AdaptHealth and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;
- strengthening the Company's internal reporting and financial disclosure controls;
- developing and implementing procedures for greater stockholder input into the policies and guidelines of the Board; and
- strengthening the Company's internal operational control functions.

D. Awarding punitive damages;

E. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: January 28, 2026


**RIGRODSKY LAW, P.A.**

By: /s/ Gina M. Serra
Gina M. Serra (#308207)
1007 North Orange Street, Suite 453
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: gms@rl-legal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Vincent A. Licata
Leah B. Wihtelin
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683.3516
Facsimile: (302) 654-7530
Email: sdr@rl-legal.com
Email: vl@rl-legal.com
Email: lw@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com